656 F.2d 398
 STATE OF ARIZONA and Arizona Department of Revenue,
Plaintiffs-Appellants,
v.
ATCHISON, TOPEKA AND SANTA FE RAILROAD COMPANY and Southern
Pacific Transportation Company, Defendants-Appellees,
and
United States of America, Intervenor/Defendant-Appellee.
 No. 79-3183.
 United States Court of Appeals,
Ninth Circuit.
 Submitted Jan. 14, 1981.
Decided June 12, 1981.
 
 Mary A. McReynolds, Washington, D. C., Anthony B. Ching, Sol. Gen., Phoenix, Ariz., argued, James D. Winter, Asst. Atty. Gen., on brief, for plaintiffs-appellants.
 Philip E. Von Ammon, Fennemore, Craig, Von Ammon & Udall, Lex J. Smith, Phoenix, Ariz., argued, Andrew S. Friedman, Earl Carroll, Evans, Kitchel & Jenckes, Phoenix, Ariz., on brief, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before WALLACE and FARRIS, Circuit Judges, and KING,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 The State of Arizona and Arizona Department of Revenue (Arizona) brought this action for a declaratory judgment in the district court against the Atchison, Topeka and Santa Fe Railroad Company and the Southern Pacific Transportation Company (the railroads). Arizona sought a declaration that its scheme of assessing property for the purpose of collecting ad valorem property taxes was consistent with section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94-210 § 306, 90 Stat. 31, 54-55, 94th Cong., 2nd Sess., reprinted in (1976) U.S.Code Cong. & Ad.News, p. 14 (the 4R Act) (current version at 49 U.S.C. § 11503). In the alternative, Arizona contended that section 306 of the 4R Act was unconstitutional. The district judge permitted the United States to intervene as a party defendant. Subsequently, he denied Arizona's motion for summary judgment and granted the railroads' and the United States' motions for summary judgment. Arizona now appeals from this judgment. We affirm.
 
 
 2
 * In 1976, Congress passed the 4R Act for the purpose of promoting the revitalization of the railway system of the United States. 4R Act, supra § 101(a). Section 306 declared it unlawful, as "an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce," 4R Act, supra, § 306, for a state to assess,
 
 
 3
 for purposes of a property tax levied by any taxing district ... transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.
 
 
 4
 4R Act, supra, § 306.[1] Although the 4R Act became law on February 5, 1976, the effective date of section 306 was set for three years after that date. Id. Section 306 was originally codified at 49 U.S.C. § 26c. Before it went into effect, however, Congress recodified the section as part of its revision of the Interstate Commerce Act. Section 306 is now codified at 49 U.S.C. § 11503. See Pub.L. 95-473 § 11503, 92 Stat. 1445, 95th Cong., 2nd Sess., reprinted in (1978) U.S.Code Cong. & Ad.News, p. 3009. Although there are some differences between the two codifications, we shall simply refer to "section 306" to mean both versions, and cite to the current codification, except when the differences between the two are at issue.
 
 
 5
 When this suit was filed, Arizona divided property into seven classes for the purpose of property tax assessment. Class 1, which was assessed at 60% of its full cash value, included railroad property as well as "flight property," property used by private car companies, various mine property, and standing timber. Ariz.Rev.Stat. §§ 42-136, 42-227 (1978). The other classes of property had lower assessment ratios ranging down to 8% of full cash value. Most, if not all, other commercial and industrial property was contained in class 2, which was assessed at 50% of full cash value, and class 3, which was assessed at 27% of full cash value.[2]
 
 
 6
 In this case, Arizona seeks a declaration that its property assessment scheme is consistent with section 306. Its position is that section 306 prevents states only from assessing railroad property at a higher ratio than it assesses every other piece of commercial and industrial property. The parties have stipulated that Arizona assessed railroad property at a ratio that exceeds by at least 5% the average assessment ratio of all other commercial and industrial property in the state.[3]
 
 
 7
 In the alternative, Arizona asserts that section 306 is unconstitutional because it was beyond the power of Congress, acting pursuant to its Commerce Clause power, to enact, and that it violates the Tenth Amendment. Arizona also contends that section 306 impermissibly requires federal courts to assess and levy taxes. We shall discuss these contentions in order after we analyze our jurisdiction to entertain this case.
 
 II
 A.
 
 8
 Arizona has properly raised a federal question in its complaint. Arizona brought this lawsuit seeking a declaration that its property tax assessment scheme is consistent with section 306 or, in the alternative, that section 306 conflicts with the federal constitution. That the question is within Arizona's well-pleaded complaint for declaratory relief does not, however, necessarily dispose of the jurisdiction issue.
 
 
 9
 In Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), the Court held that the Declaratory Judgment Act is procedural only, and does not extend the jurisdiction of the federal courts. Id. at 671, 70 S.Ct. at 878-79. The plaintiff sought a declaration that a contract was still in effect because a condition of the contract that depended on the action of a federal agency pursuant to federal law had been fulfilled. The Court observed that absent the Declaratory Judgment Act the cause of action would have been one for breach of contract, which would not arise under federal law. The federal law in the case could be invoked only as a defense. Because federal question jurisdiction cannot be invoked when the plaintiff's claim does not contain an element of federal law, but merely anticipates that the defendant will raise a defense under the Constitution or federal law, the Court held that there was no federal question jurisdiction over the declaratory judgment action. Id. at 672, 70 S.Ct. at 879. The Supreme Court later observed that
 
 
 10
 (w)here the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court.
 
 
 11
 Public Service Comm'n v. Wycoff Co., 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952) (dictum).
 
 
 12
 In essence, the Declaratory Judgment Act allows a plaintiff to bring a suit now when, if there were no such act, the plaintiff would be required to await further events. Although it provides for advanced ripening, it does not create federal jurisdiction over the issue presented. Thus, Skelly Oil teaches that we must analyze our jurisdiction in a declaratory judgment action as if the Declaratory Judgment Act did not exist.
 
 
 13
 The present lawsuit could arise in two different ways if there were no Declaratory Judgment Act. One would be a suit brought by the state pursuant to state law to collect taxes from the railroads. There would be no federal jurisdiction over this case, because the only issue of federal law would be the defense of section 306 that the railroads would raise. It would not be a ground for federal jurisdiction if the state merely anticipated the federal defense and asserted that the defense was not valid. Louisville & N. R. R. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908).
 
 
 14
 The other way in which this suit could arise is a suit by the railroads to enjoin the state from assessing taxes pursuant to the state's taxation scheme. This case would satisfy the requirements of federal jurisdiction under section 1331 because it would arise under section 306. Section 306 would be the basis asserted by the plaintiffs to have the state taxation scheme enjoined. This cause of action, however, would run afoul of 28 U.S.C. § 1341. Section 1341 provides that "(t)he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." We have observed that section 1341 is a "jurisdictional bar." Mandel v. Hutchinson, 494 F.2d 364, 366 (9th Cir. 1974). Thus, even though the plaintiff's well-pleaded complaint would bring the case within federal question jurisdiction, section 1341 would divest the federal courts of jurisdiction.
 
 
 15
 We do not think the policy behind this divestiture of jurisdiction applies to a case such as this one. Section 1341 was designed to eliminate interference by federal courts in state internal economy and taxation matters. Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 298-99, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407 (1943). This policy would not be served by applying the statute to bar a state itself from invoking the jurisdiction of the federal courts. In addition, Congress removed the jurisdictional bar of section 1341 for cases brought under section 306 after its effective date.[4] Under these circumstances, the jurisdictional bar of section 1341 cannot apply to this case. Therefore, because there is a federal question raised by the plaintiff in the action that underlies this declaratory judgment action, and the jurisdictional bar of section 1341 does not apply, the federal courts have jurisdiction to hear this case.
 
 B.
 
 16
 A second jurisdictional problem in this case is whether the issues presented are ripe for adjudication. Arizona filed its lawsuit in the district court on August 16, 1978. Section 306, though enacted on February 5, 1976, was not to become effective until February 5, 1979. Thus, this lawsuit was filed before the effective date of the statute that it was challenging. Such a case runs the risk of being so premature that the issues presented are not sufficiently concrete to present a case or controversy within the meaning of Article III of the United States Constitution. In assessing the problem of ripeness in declaratory judgment cases involving challenges to government regulation that has not yet occurred, the Supreme Court has stated:
 
 
 17
 While the courts should not be reluctant or niggardly in granting (a declaratory judgment) in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especialy (sic) in the field of public law.... The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.
 
 
 18
 Public Service Comm'n v. Wycoff Co., supra, 344 U.S. at 243-44, 73 S.Ct. at 240. The Supreme Court has further observed that "(w)here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." Blanchette v. Connecticut Gen. Ins. Corp., 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). See also Babbitt v. United Farm Workers, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308-09, 60 L.Ed.2d 895 (1979).
 
 
 19
 The issues presented in this case are sufficiently concrete and the operation of section 306 against the state so inevitable that we have jurisdiction under Article III. The lawsuit was filed approximately two and one-half years after section 306's passage, and six months before its effective date. One of the purposes of delaying the effective date of section 306 was to permit states that were taxing railroads in a discriminatory fashion to come into compliance with the statute. By the time the lawsuit was filed, the Arizona legislature had not altered its scheme of assessing railroad property in three legislative sessions. There was little likelihood that either Arizona or Congress would substantively alter the statutes over which the parties are in disagreement before the effective date of section 306.[5] In addition, during the first week in August 1978, the railroads informed the state that they intended to avail themselves of the remedies provided in section 306 to prevent discriminatory taxation of railroads when section 306 became effective the following February.
 
 
 20
 In light of these circumstances, the positions of the parties were sufficiently crystallized by the time of the filing of this lawsuit to create a case or controversy. At that time, it could be realistically concluded that section 306 would come into effect on February 5, 1979, that the Arizona scheme of assessing railroad property would remain the same, and that the railroads would seek to invoke section 306 to invalidate the Arizona scheme. We agree with the district court that the case was ripe for adjudication when it was filed.
 
 III
 
 21
 Arizona's first contention is that its scheme of assessing railroad property is consistent with section 306. It argues that we should look at section 306 as it was originally passed. See 4R Act, supra, § 306. Arizona asserts that the original language should be used because the recodification of section 306 provides that it merely restates "without substantive change" prior law and that it "may not be construed as making a substantive change in the laws replaced." Pub.L. 95-473, supra, § 3(a), 92 Stat. 1466. The original version of the statute prohibited states from assigning transportation property at a higher assessment ratio than that assigned to "all other commercial and industrial property ...." 4R Act, supra, § 306(1)(a) (emphasis added). In the current version, the word "all" is deleted. 49 U.S.C. § 11503(b)(1). Arizona contends, however, that because the amendment effected no substantive change in the statute, we must construe the statute as if the word "all" were still included.
 
 
 22
 Arizona must make this argument because its statutory construction position depends on an interpretation of the word "all." It contends that section 306 prohibits states only from assigning railroad property a higher assessment ratio than every other form of commercial and industrial property. It asserts that its scheme is consistent with section 306 because, though it places railroad property in the highest assessment ratio class, it also places some other forms of commercial and industrial property in that class. Thus, Arizona concludes that, because it assesses some other property at the same ratio as railroad property, it does not assess railroad property at a ratio higher than all other commercial and industrial property.
 
 
 23
 The district judge applied the original version of the statute, even though the amendment was passed before his decision. He held, however, that Arizona's interpretation of the word "all" was incorrect. He interpreted "all" to mean "aggregate." Thus, he held that Arizona's assessment scheme was inconsistent with section 306 because railroad property was assessed at a higher ratio than the average assessment ratio assigned to all other commercial and industrial property.
 
 
 24
 Although the meaning of the word "all" in the context of the statute is somewhat ambiguous, the legislative history provides clear support for the district judge's interpretation.[6] The legislative history is clear that Congress understood the term "all other property" to mean property in the aggregate. The pertinent comparison was meant to be between the property of the railroad and that of the "average" taxpayer: "(t)o make the fairest comparison that of the carrier with the hypothetical 'average' taxpayer the committee intends that the unit to be used is that of all parcels of property in the district, considered in the aggregate." S.Rep. No. 91-630, 91st Cong., 1st Sess. 10 (1969). Other interpretations were explicitly rejected. The language was not meant to permit railroads to demand the same treatment as those holding property with the lowest assessment ratio, and it was not meant to permit a state to claim, as Arizona does, that its treatment of railroad property was not discriminatory simply because there was one parcel of property assessed at the same or higher ratio than that of the railroads. Id. at 26; S.Rep. No. 1483, 90th Cong., 2d Sess. 23 (1968).
 
 
 25
 Although the statute standing alone is not unambiguous, it does lend additional, indirect support for the clear interpretation provided by the legislative history. The legislative history contemplates that the average assessment ratio should be proven by the use of a statistical method called the sales assessment ratio study. S.Rep. No. 91-630, supra, at 26, 27. The statute explicitly provides that use of this technique is the preferred method of demonstrating the assessment ratio of other commercial and industrial property. 49 U.S.C. § 11503(c). This method of proof would be totally unnecessary if, as Arizona contends, the issue was simply whether there was any property with the same or higher assessment ratio as railroad property.[7]
 
 
 26
 Although we have given Arizona the benefit of the doubt and interpreted the language in the original version, which is arguably more favorable to Arizona, we think it is the amended version that should have been considered by the district judge. The original version of the statute never went into effect. Only the amended version actually became law. See supra. The amended version, however, provides even stronger evidence that Arizona's interpretation is incorrect. Arizona's interpretation depends upon its construction of the word "all." By removing the word "all" and stating that it was making no substantive change in the statute, Congress eliminated Arizona's interpretation of the statute. Without the word "all," there is no argument that Congress meant that railroad property could not have a higher assessment ratio than each and every other kind of property.
 
 
 27
 Arizona makes two additional points in support of its interpretation of the statute. First, it claims that the comparison between the assessment ratios of railroad property and those of other commercial and industrial properties must take place in many different "assessment jurisdictions" within the State. Arizona contends that if railroads can be assessed at ratios no more than the average ratio within each assessment jurisdiction, then the assessment ratio of railroad property will vary from jurisdiction to jurisdiction depending on what other kinds of property are present within that jurisdiction. This, Arizona asserts, would create "great inequities and utter chaos." The statute, however, defines "assessment jurisdiction" as "a geographical area in a State used in determining the assessed value of property for ad valorem taxation." 49 U.S.C. § 11503(a)(2). The Arizona scheme of assessing the value of property is statewide. The state statutes that Arizona claims are consistent with section 306 operate throughout the entire state, and are not limited in their operation to certain local entities. Therefore, we think the "assessment jurisdiction" at issue in the case is the entire State of Arizona, and that Arizona's interpretation that section 306 would create unequal assessments within the state is erroneous. Even if this interpretation were correct, however, it is not sufficient to overcome the clear intent of Congress that railroad property be compared to other commercial and industrial property in the aggregate.
 
 
 28
 Second, Arizona takes issue with the use by the district court of congressional findings that Arizona was among states that taxed railroads in a discriminatory fashion. See S.Rep. No. 91-630, supra, at 1, 3-5. Arizona submits that an Arizona Supreme Court case decided subsequent to this congressional finding that upheld Arizona's classification against constitutional attack negated the congressional finding of discrimination. Arizona concludes that because the finding of discrimination had been overruled, the use of this early legislative history is unreliable and should not be used to support the interpretation of "all other commercial and industrial property." Even if this premise were correct, the conclusion does not follow. That Congress might have been in error about the activities of one particular state does not mean that it was in error about what it intended statutory language to mean.
 
 
 29
 Arizona's premise is, however, erroneous. The court decision to which it refers is Apache County v. Atchison, T. & S.F.R.R., 106 Ariz. 356, 476 P.2d 657 (1970), app. dism'd, 401 U.S 1005, 91 S.Ct. 1257, 28 L.Ed.2d 542 (1971) (Apache County ). In that case the court rejected claims by the railroads that its property assessment scheme was unconstitutional. The railroads raised three grounds of unconstitutionality: (1) the scheme violated the uniform tax clause of the state constitution; (2) the classification scheme discriminated against and unduly burdened interstate commerce; and (3) the scheme violated the due process clauses of the state and federal constitutions and the equal protection clause of the federal constitution. The court rejected these constitutional claims. Arizona now contends that the court's holding compels the conclusion that the Arizona assessment scheme is non-discriminatory, and that Congress could not have been directing section 306 at that scheme.
 
 
 30
 This contention is without merit. In the realm of interstate commerce, it is one thing to say that a state statute passes constitutional muster in the absence of congressional legislation, and quite another to say that the same state statute may stand in the face of a conflicting law enacted by Congress. See Southern Pacific Co. v. Arizona, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945), and discussion infra. We shall address in the next section whether Congress overstepped its constitutional limitations in enacting section 306. For the present purpose, however, we need merely say that the decision in Apache County has no bearing on what Congress intended in passing section 306. Congress's power is not limited to curing constitutional defects. It did not need to find that states were unconstitutionally discriminating against railroads before it passed section 306. Its finding of discrimination was a matter of policy. Although Apache County may stand for the proposition that states may constitutionally assess railroad property at higher ratios than it assesses other commercial and industrial property, this does not bar Congress, if it is otherwise acting within constitutional boundaries, from determining that states ought not do so. Therefore, Apache County does not "overrule" Congress's finding that Arizona was discriminating in its property assessment scheme against railroad property.
 
 IV
 
 31
 Arizona argues, as an alternative to its statutory construction position, that section 306 is unconstitutional. Arizona contends that Congress lacks the authority to regulate Arizona's power to tax property located entirely within its borders. Arizona further argues that section 306 is an undue impairment of state sovereignty, and thus is unconstitutional under the Tenth Amendment, as interpreted by National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (National League of Cities ).
 
 A.
 
 32
 Arizona's argument misconstrues the nature of Congress's power under the Commerce Clause. The cases on which it relies for its proposition that the state power to tax is absolute, involve situations in which Congress had not acted. See Railroad Co. v. Peniston, 85 U.S. (18 Wall.) 5, 21 L.Ed. 787 (1873); Nathan v. Louisiana, 49 U.S. 74, 8 How. 73, 12 L.Ed. 993 (1850).[8] When Congress has not acted, the Commerce Clause of its own force acts as some restraint on a state's ability to tax. Freeman v. Hewit, 329 U.S. 249, 252-53, 67 S.Ct. 274, 276-77, 91 L.Ed. 265 (1946); see Southern Pacific Co. v. Arizona, supra, 325 U.S. at 769, 65 S.Ct. at 1520. In broad terms, the Commerce Clause restricts states from taxing more than their fair share of interstate commerce or from otherwise discriminating against interstate commerce. See Norfolk & W. Ry. v. Missouri State Tax Comm'n, 390 U.S. 317, 323, 88 S.Ct. 995, 999, 19 L.Ed.2d 1201 (1968). The Arizona Supreme Court upheld the validity of the Arizona assessment scheme against a Commerce Clause attack prior to the enactment of section 306. In Apache County, supra, the court rejected the railroads' claims that the state property tax assessment scheme discriminated against interstate commerce because it resulted in higher assessment ratios for railroads than for most other property. The court observed that the interstate railroads had their property assessed at the same ratio as the property of wholly intrastate railroads. The court concluded that, though distinctions existed in the classifications of various kinds of property, these distinctions were not based on the interstate or intrastate nature of the property. Thus, the court held that the Commerce Clause was not violated because there was no discrimination against interstate commerce. It was not argued that Arizona was taxing property that was attributable to out of state operations. Apache County, supra, 106 Ariz. at 361-62, 476 P.2d at 662-63.
 
 
 33
 In this case, we do not deal with the validity of a state tax under the Commerce Clause. Neither apportionment of property for tax purposes among several states nor discriminatory taxing, in the constitutional sense, are issues in this case. Rather, we must determine whether Congress has properly exercised its positive Commerce Clause power. In making this determination, it is totally irrelevant whether Arizona's tax is otherwise constitutional:
 
 
 34
 Congress has undoubted power to redefine the distribution of power over interstate commerce. It may either permit these states to regulate the commerce in a manner which would otherwise not be permissible, ... or exclude state regulation even of matters of peculiarly local concern which nevertheless affect interstate commerce.
 
 
 35
 Southern Pacific Co. v. Arizona, supra, 325 U.S. at 769, 65 S.Ct. at 1520 (citations omitted).
 
 
 36
 The power of Congress to regulate interstate commerce is unmistakably broad. Congress may regulate any activities except " 'those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government.' " Katzenbach v. McClung, 379 U.S. 294, 302, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964), quoting Gibbons v. Ogden, 22 U.S. 1, 86, 9 Wheat. 1, 195, 6 L.Ed. 23 (1824). Although Arizona contends that the railroad property in question is purely local in character, and thus immune from Congress's Commerce Clause power, state taxation of property situated totally within one state that is used by an interstate railroad so greatly affects interstate commerce that regulation of it is clearly within the scope of Congress's Commerce Clause power. See United States v. Women's Sportswear Mfrs. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949); Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942).
 
 
 37
 Arizona's position that Congress may never interfere with the state power to tax is without merit. The well-known principle of McCulloch v. Maryland, 17 U.S. 159, 206, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819), does not permit such a limitation:
 
 
 38
 Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional. (footnote omitted).
 
 
 39
 In the case before us, the legitimate end of Congress is to revitalize the nation's railroads to improve the flow of interstate commerce. The means that Congress has adopted, prohibiting states from assessing railroad property at higher ratios than other commercial and industrial property, is "plainly adapted to that end," by having the effect of diminishing the proportionate tax burden on railroads, and is not otherwise prohibited. We know of no authority for the proposition that Congress may not interfere with state taxation in furtherance of its power over interstate commerce. Indeed, the Supreme Court has indicated that Congress has the power to protect interstate commerce from state taxation. State Bd. of Ins. v. Todd Shipyards Corp., 370 U.S. 451, 456, 82 S.Ct. 1380, 1383, 8 L.Ed.2d 620 (1962). See also Arizona Pub. Serv. Co. v. Snead, 441 U.S. 141, 150, 99 S.Ct. 1629, 1634, (1979) (Snead ).
 
 B.
 
 40
 Congress's power to enact section 306 is unaffected by the Tenth Amendment, as interpreted by National League of Cities, supra. There, the Supreme Court struck down the application of the minimum wage and maximum hour provisions of the Fair Labor Standards Act to employees of the states and their various political subdivisions. The Court stated the issue in the case as whether the terms and conditions of employment of state employees are " 'functions essential to separate and independent existence' ... so that Congress may not abrogate the States' otherwise plenary authority to make them." National League of Cities, supra, 426 U.S. at 845-46, 96 S.Ct. at 2471, quoting Lane County v. Oregon, 74 U.S. (7 Wall.) 71, 76, 19 L.Ed. 101 (1868). The Court emphasized that the federal law imposed increased costs on local governments, forced local governments to curtail important programs, and "displace(d) state policies regarding the manner in which they will structure delivery of those governmental services which their citizens require." Id. at 847, 96 S.Ct. at 2472. The Court concluded that "Congress (had) sought to wield its power in a fashion that would impair the States' 'ability to function effectively in a federal system ....' " Id. at 852, 96 S.Ct. at 2474, quoting Fry v. United States, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1795 n.7, 44 L.Ed.2d 363 (1975). Justice Blackmun joined the 5-4 majority in National League of Cities with the understanding that the Court was adopting a balancing approach between state and federal interests. National League of Cities, supra, 426 U.S. at 856, 96 S.Ct. at --- (Blackmun, J., concurring).
 
 
 41
 Whether or not Justice Blackmun is correct in his interpretation of National League of Cities, that case does not require us to invalidate section 306. Section 306 requires no change in structure of state government. See Friends of the Earth v. Carey, 552 F.2d 25, 38 (2d Cir.), cert. denied, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). It does not require the states to alter or abolish any state programs or services. It does not displace state policy in the determination of the performance of basic governmental services. Indeed, it may not even cost the state money, in terms of decreased tax revenues. At most, section 306 requires states to alter their tax structures so that railroad property is assessed at a ratio no higher than that of other commercial and industrial property.[9]
 
 
 42
 Moreover, section 306 does not affect an area of power traditionally regarded as an integral part of state sovereignty. The Court in National League of Cities indicated that one of the cases that remained valid after National League of Cities was United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936).[10] In that case, California's operation of a railroad, which was engaged in interstate commerce, was held subject to federal regulation. The Court in National League of Cities indicated that this was not "an area that the States have regarded as integral parts of their governmental activities," National League of Cities, supra, 426 U.S. at 854 n.18, 96 S.Ct. at 2475 n.18, and was therefore subject to congressional regulation. Cf. United Transp. Union v. Long I.R.R. Co., 634 F.2d 19, 26 (2d Cir. 1980) (distinguishing United States v. California to hold that state operation of a passenger, as opposed to a freight, railroad is an integral government function). By the same token, although assessment of property tax might otherwise arguably be an integral part of a state's governmental activities, no state could reasonably expect that its taxation of an instrumentality of interstate commerce was immune from congressional regulation. Power, including the power to tax, over instrumentalities of interstate commerce has not traditionally been limited to the states, and thus is not truly an integral part of state sovereignty. See United States v. Best, 573 F.2d 1095, 1102-03 (9th Cir. 1978).
 
 
 43
 A similar analysis is appropriate under Justice Blackmun's balancing approach. In National League of Cities the state interest outweighed the federal interest because of the severe burdens imposed on the states by the federal regulation, and the minimal effect of the statute on interstate commerce. In the case before us, however, the burden on the state is small in comparison to the benefit to interstate commerce. Congress enacted section 306 as a measure to assist the troubled railroad industry. The federal government has a strong and legitimate interest in supporting the railroad industry to enhance interstate commerce and travel. The burden on the states in altering their assessment schemes is slight. Therefore, the balance tips in favor of the federal interest, and the legislation may stand.
 
 C.
 
 44
 The views that we have expressed concerning the constitutionality of section 306 are confirmed by the Supreme Court's opinion in Snead, supra. In Snead, Congress passed a statute that prohibited states from assessing any tax on the generation of electricity that discriminated against out of state producers, sellers, or users. Congress determined that a tax was discriminatory if it resulted, directly or indirectly, in a greater tax burden on interstate electricity than on intrastate electricity. Snead, supra, 441 U.S. at 146, 99 S.Ct. at 1632. The State of New Mexico imposed a tax on the generation of electricity. The tax rate was the same for electricity consumed in state as it was for that consumed out of state. The state, however, permitted that tax to be credited against its gross receipts tax. Because the gross receipts tax was imposed only against electricity consumed within New Mexico's borders, the effect was that the generation tax fell more heavily on electricity generated out of state than on that generated in state. New Mexico argued that the statute was "sterile" that is, that the statute prohibited no more than the Commerce Clause by itself would prohibit. Using Commerce Clause analysis, New Mexico argued that the generation tax did not discriminate against interstate commerce because the total tax burden on power sold within the state was greater than that on power sold outside of the state, taking into account the gross receipts tax. The Court rejected this analysis. It observed that Congress had intended that the provision go further than the Commerce Clause would have by itself. The Court held that the New Mexico tax violated the statute because the statute prohibited any tax that discriminated against out of state use, not merely discriminatory tax structures as a whole. Id. at 149, 99 S.Ct. at 1634. Having determined that New Mexico's tax violated the federal statute, the Court held the statute constitutional. It observed that Congress has a broad power under the Commerce Clause: "Congress had a rational basis for finding that the New Mexico tax interfered with interstate commerce, and selected a reasonable method to eliminate that interference. The legislation thus was within the constitutional power of Congress to enact." Id. at 150, 99 S.Ct. at 1634. Justice Rehnquist filed a separate concurring opinion, indicating that he thought the New Mexico tax would be valid under the Commerce Clause absent the federal statute. Id. at 152 n. *, 99 S.Ct. at 1635 n. *. (Rehnquist, J., concurring).
 
 
 45
 Snead is instructive on both of Arizona's constitutional arguments. First, it indicates that Congress may use its Commerce Clause power to curtail the power of a state to tax. Although the case was decided three years after National League of Cities, neither the majority opinion nor Justice Rehnquist's concurring opinion cites National League of Cities. Thus, it is apparent that the Court did not see National League of Cities as a limitation on Congress's ability to use its Commerce Clause power to impair state taxation of subjects of interstate commerce.
 
 
 46
 Second, Snead illustrates the distinction between the negative and positive implications of the Commerce Clause. Although the majority offered no view concerning the validity of the New Mexico tax under the Commerce Clause standing alone, it found it necessary to determine whether the federal statute was a broader prohibition of state power than the Commerce Clause alone was. Justice Rehnquist indicated his belief that the statute would survive Commerce Clause scrutiny absent federal legislation. Thus, Snead confirms that there is no merit to Arizona's argument in the case before us that Congress may not use its Commerce Clause power to interfere with a state tax that has already been held constitutional against a Commerce Clause attack. Congress has the power, under the Commerce Clause, to regulate state activity that would otherwise be permissible under the Commerce Clause. Congress may, as it has done here, prohibit a state taxing scheme that it finds, as a matter of policy, discriminatory against interstate commerce, even though that scheme is not discriminatory in a constitutional sense. Cf. State Bd. of Ins. v. Todd Shipyards, supra, 370 U.S. at 456, 82 S.Ct. at 1384 (Congress's power to protect "interstate commerce against state regulation or taxation ... is so complete that its ideas of policy should prevail." (citations and footnote omitted)).
 
 
 47
 We conclude that section 306 is a valid exercise of Congress's Commerce Clause power. It is designed to assist an instrumentality of interstate commerce, and is a reasonable method of doing so. It does not unduly impinge on the sovereignty of Arizona, and thus does not fall within the proscription of National League of Cities.
 
 V
 
 48
 Arizona's final contention is that section 306 impermissibly requires federal courts to assess and levy taxes in violation of the holding of Moses Lake Homes, Inc. v. Grant County, 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961). In that case, the Supreme Court held that a federal court may not make the adjustment necessary to make an invalid state tax valid. The courts are limited to determining whether existing taxes are valid, and have no power to substitute a valid tax for the invalid tax. Id. at 751-52, 81 S.Ct. 874.
 
 
 49
 Section 306, as it was originally enacted, appears to have prohibited only that portion of an assessment that was excessive. The statute prohibited "(t) he assessment (but only to the extent of any portion based on excessive values as hereinafter described) ...." 4R Act, supra, § 306. We do not need to interpret this language, however, or to analyze Moses Lake Homes, Inc. v. Grant County, supra, as it may bear on these words. When section 306 was recodified, this language was deleted. No comparable language currently appears in the statute. As we have observed, only the recodification of section 306 ever went into effect. It is not necessary to interpret language in a statute that never went into effect, when there is no language in the current statute that may lend itself to the interpretation put forward by Arizona.
 
 VI
 
 50
 We conclude, then, that the district court was correct in granting summary judgment against Arizona. The only error that we perceive is that the district judge improperly applied the old statute, 4R Act, supra, § 306, rather than the new statute, 49 U.S.C. § 11503. As we have seen, however, this did not affect the outcome of the case. We hold, therefore, that there was federal court jurisdiction to entertain this declaratory judgment action, that Arizona's scheme for assessing property for ad valorem tax purposes was not consistent with section 306, and that section 306 was enacted pursuant to a valid exercise of Congress's Commerce Clause power.
 
 
 51
 AFFIRMED.
 
 SAMUEL P. KING, Chief Judge, dissenting:
 
 52
 I respectfully dissent from the conclusion that federal jurisdiction lies in the posture of this case. The plaintiff is the State of Arizona, not the railroad. The only federal question that the State of Arizona raises is the anticipated defense of the railroad based upon a federal statute. This is squarely within the holding of Louisville & N.R.R. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).
 
 
 53
 Mottley interpreted what is now 28 U.S.C. § 1331 and, though the Mottley result was not constitutionally mandated, Congress has not amended section 1331 to remove the Mottley limitation. The jurisdiction provision of the 4R Act, 49 U.S.C. § 11503(c), does not enact a special exception to Mottley. The granted nonexclusive jurisdiction is "to prevent a violation of subsection (b) of this section." The earlier version, 49 U.S.C. § 26c (Title III, § 306, of Pub.L. 94-210), also gave nonexclusive jurisdiction only "to grant such mandatory or prohibitive injunctive relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate any acts in violation of this section," with exceptions. The State of Arizona's claims are not brought to prevent a violation of the Act, but rather to obtain a declaratory judgment as to a claim for which there is no underlying case or controversy.
 
 
 54
 Furthermore, even if there was a case or controversy under the earlier Arizona statute, that statute has been amended to conform to the federal statute. Hence, that issue is now moot unless the railroad sues for any taxes that might have been collected under the earlier statute. Under the present Arizona statute, there is no case or controversy.
 
 
 
 *
 Honorable Samuel P. King, United States District Judge, District of Hawaii, sitting by designation
 
 
 [1]
 For convenience, we shall use the shorthand term "assessment ratio" to mean the ratio of assessed value of property for the purpose of property tax to the full cash value of the property
 
 
 [2]
 In 1979, Arizona amended its assessment scheme for railroad property, apparently in an attempt to conform to section 306. Arizona made railroad property and private car company property a separate class, and assessed it at a ratio of 36%. Arizona made this provision conditional, however. The provision stated that it "shall be deemed never to have become effective if the provisions of (the 4R Act) § 306 ... are found to be unconstitutional by a federal court of final jurisdiction." S. 1255, Ch. 142, 34th Legis. (1979)
 In 1980, the Arizona legislature further amended its assessment scheme, again in an apparent attempt to conform to section 306. Under this scheme, which is still in effect in Arizona, railroad property and property used by private car companies remain a separate class of property, denominated class 7. Ariz.Rev.Stat. § 42-136. Class 7 property is assessed at a ratio of 34% for 1980. For years after 1980, class 7 property is to be assessed at a ratio equal to the ratio that "(t)he total assessed valuation ... of all property in classes 1, 2 and 3 bears to the total full cash value of such property ... as required by federal law." Ariz.Rev.Stat. § 42-227(B)(7).
 
 
 [3]
 Technically, it is a violation for a state to assign an assessment ratio to railroad property that is any higher than the assessment ratio assigned to other commercial and industrial property. 49 U.S.C. § 11503(b)(1). Section 306, however, does not permit a court to grant relief unless the assessment ratio of railroad property exceeds the assessment ratio of other commercial and industrial property by at least 5%. 49 U.S.C. § 11503(c)
 
 
 [4]
 This analysis would have been unnecessary if the action had been filed after the effective date of section 306. Because the action was filed before that effective date, the railroads had to rely on the general federal question jurisdiction pursuant to 28 U.S.C. § 1331. Section 306, however, contains its own jurisdictional predicate, and creates an explicit exception to the jurisdictional bar of section 1341. 49 U.S.C. § 11503(c)
 
 
 [5]
 Both the federal and state statutes have, in fact, been amended since the filing of this lawsuit. The amendment to section 306, which occurred on October 17, 1978, between the filing of this case and the effective date of the statute, effected no substantive changes pertinent to this lawsuit. See infra. Arizona has twice amended its scheme of assessing railroad property in an apparent effort to comply with section 306. See footnote 2, supra. Neither amendment moots this case. The first amendment provided that if section 306 is declared unconstitutional, the new statute will be deemed never to have come into existence, and the old statute shall be deemed to have remained in force. The second amendment, though arguably bringing Arizona into permanent compliance with section 306 (this question is not before us), does not apply retroactively. Thus, the issue of the proper tax for at least the calendar year 1979 after the February 5, 1979, effective date of section 306, remains at issue
 
 
 [6]
 Before passing section 306, Congress had considered proposals virtually identical to it since 1961. Compare 49 U.S.C. § 11503 with S.Rep. No. 445, 87th Cong., 1st Sess. 465 (1961). Arizona objects to the consideration of the legislative histories of prior bills, citing Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381-82 n.11, 89 S.Ct. 1794, 1802 n.11, 23 L.Ed.2d 371 (1969), in which the Court stated that "unsuccessful attempts at legislation are not the best of guides to legislative intent." In Red Lion, however, none of the prior bills had become law, and the legislative history was inconclusive. In this case, the prior bills are nearly identical to section 306 as it was enacted. The legislative histories of the prior bills are consistent and clear with respect to this point. In ascertaining the intent of Congress, we see no objection to giving some weight to clear legislative histories of prior bills that are identical to the law we are called on to interpret
 
 
 [7]
 If Arizona's position were correct, all it would have to do to avoid section 306 is point to one other form of commercial or industrial property that was assessed at the same, or higher, ratio than railroad property. There would then be no need to look at the average assessment ratio of all commercial and industrial property. Thus, statutory provision of a method to determine this average would be superfluous
 
 
 [8]
 Arizona also cites Lane County v. Oregon, 74 U.S. (7 Wall.) 71, 19 L.Ed. 101 (1868). Lane County is not in point for a different reason. Congress had passed a statute authorizing the use of United States notes for payment of public and private debts. Oregon required that all state and school taxes be paid in gold and silver coin. Oregon sued Lane County for payment of taxes, in coin, which the county asserted had already been tendered in United States notes. Id. at 72. Arizona quotes broad language from the opinion to the effect that the power of the states to tax is free from federal interference. See id. at 77. The case does not stand for such a broad proposition. The opinion recognizes that the state taxing power "must not be used so as to burden or embarrass the operations of the national government." Id. The case does not address whether the federal government, in the exercise of its Commerce Clause power, may restrict the states from taxing instrumentalities of interstate commerce. Rather, the case is limited in its holding to the proposition that the federal government has no interest in the currency in which a state chooses to collect its own taxes. Id. Supreme Court cases decided in the 113 years since Lane County confirm our view that Congress is not prevented from using its Commerce Clause power to interfere with at least some aspects of the states' power to tax. See infra
 
 
 [9]
 On its face, section 306 does not require states to reduce taxes or even to reduce the assessment ratio of railroad property. We assume that states could comply with section 306 by raising the ratios of other properties in order to make the assessment ratio of railroad property not exceed that of the aggregate of other commercial and industrial property. The more likely possibility is that states will reduce the assessment ratio of railroad property and make up the lost revenue by increasing the assessment ratios of other properties, or by some method independent of property tax assessment
 
 
 [10]
 The only case expressly overruled by National League of Cities was Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)