**CLINCHFIELD RAILROAD COMPANY; Durham & Southern Railway Company; High Point, Thomasville & Denton Railroad Company; Louisville & Nashville Railroad Company; Norfolk, Franklin & Danville Railway Company; Norfolk Southern Railway Company; Norfolk & Western Railway Company; Seaboard Coast Line Railroad Company; Southern Railway Company; and Winston-Salem Southbound Railway Company, Appellees,**

v.

**Mark G. LYNCH, Secretary of Revenue of the State of North Carolina; and Douglas R. Holbrook, Director, Ad Valorem, Tax Division of the North Carolina Department of Revenue, Mecklenburg County, Appellants.**

**and**

**Madison County, Defendant.**

No. 82–1049.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1982.

Decided Feb. 3, 1983.

Rehearing and Rehearing En Banc Denied March 30, 1983.

See also, D.C., 527 F.Supp. 784.

**128**

Hamlin L. Wade, Charlotte, N.C. (Ruff, Bond, Cobb, Wade & McNair, Charlotte, N.C., George W. Boylan, Jr., Asst. Atty. Gen., Raleigh, N.C., on brief), for appellants.

Everett B. Gibson, Memphis, Tenn. (Gregory G. Fletcher, Laughlin, Halle, Clark & Gibson, Memphis, Tenn., Armistead J. Maupin, Charles B. Neely, Jr., Nancy S. Rendleman, Maupin, Taylor & Ellis, P.A., Raleigh, N.C., William C. Basney, Jacksonville, Fla., L.P. McLendon, Jr., Edward C. Winslow, III, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., William C. Antoine, James W. McBride, Memphis, Tenn., on brief), for appellees.

Before WIDENER and MURNAGHAN, Circuit Judges, and GORDON,\* Senior District Judge.

MURNAGHAN, Circuit Judge:

■ It is a fact widely known, recognized by Congress, and not contested here by the parties that property taxation by the several states has, for many years, operated in a fashion inherently discriminatory against the railroads. In 1976, Congress set out to eliminate the discrimination, passing § 306 of the Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94–210, 90 Stat. 54, now codified at 49 U.S.C. § 11503.[1]

---

\* The Honorable Eugene A. Gordon, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

1. Congressional concern over discriminatory state taxation of railroads was piqued as early as 1961, when a special study group reported to the Senate Committee on Interstate and Foreign Commerce that "there is much to support the position that ad valorem property taxes on interstate carriers ... should be relieved on two grounds: (1) that such taxes are discriminatory as between taxpayers in the same jurisdiction; and (2) that they result in unfair competitive advantage to those carriers not so taxed." Special Study Group on Transportation Policies in the United States, 87th Cong., 1st Sess., *National Transportation Policy* 463 (Comm. Print 1961). The study group recommended as one alternative solution to the problem an "antidiscrimination tax law" substantially similar to § 306. *Id.* at 465–66.

In 1967, just such an antidiscrimination bill was introduced. *See* S. 927, 90th Cong., 1st

Sess., 113 Cong.Rec. 2887 (1967). So, too, in 1969. *See* S. 2289, 91st Cong., 1st Sess., 115 Cong.Rec. 14332 (1969). Both bills, and their considerable supportive legislative materials, constitute the chief ancestry of § 306, which, as one small part of the massive Railroad Revitalization and Regulatory Reform Act, actually received scant attention in the legislative history produced by the 94th Congress. *See, e.g.,* H.Rep. No. 725, 94th Cong., 2d Sess. (1975). Other bills of a similar pedigree also were introduced. *See* H.R. 7421, 87th Cong., 1st Sess., 107 Cong.Rec. 9375 (1961); H.R. 4972, 89th Cong., 1st Sess., 111 Cong.Rec. 2761 (1965); S. 1891, 93d Cong., 1st Sess., 119 Cong.Rec. 17024 (1973).

In accordance with Pub.L. No. 95–473, 92 Stat. 1466 (1978), § 306 was moved from its original location at 49 U.S.C. § 26c and certain changes in language were made. The statute calling for recodification of the Interstate Commerce Act makes clear, however, that the changes in language were not to affect the substance of § 306. *See also* H.Rep. No. 1395,

Section 306 makes clear that it is directed at practices both as to real property taxation and as to personal property taxation, and that remedies prescribed under the section are to be fashioned and applied so as to correct inequities in both categories.[2]

However, § 306 also accords priority for determination of the initial question of whether for any particular year there has in fact been discrimination in taxation to statistical studies called sales-assessment ratio studies developed with respect to real property.[3] Concentration on statistics attributable to real property by recourse to sales-assessment ratio studies is explained by the fact that, through stamps on deeds covering recent transfers of real estate, it is often relatively simple to develop reliable figures to show whether real estate of railroads, as compared with or contrasted to real estate of other, especially non-public utility, taxpayers, has been equitably taxed.[4]

■ Here the fact of discriminatory real estate taxation in North Carolina for

---

. 95th Cong., 2d Sess., *reprinted in* 1978 U.S. Code Cong. & Ad.News 3009. As the parties, the district court, and other courts, *see, e.g., Alabama Great Southern R.R. v. Eagerton,* 663 F.2d 1036 (11th Cir.1981); *Ogilvie v. State Board of Equalization,* 657 F.2d 204 (8th Cir. 1981), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981); *but see State of Arizona v. Atchison, T. & S.F.R.R.,* 656 F.2d 398 (9th Cir.1981), have done, we will refer to the original text of § 306 for purposes of analysis.

2.  Section 306, in general, calls for a comparison of the assessments imposed upon railroad property with the assessments imposed upon other "commercial or industrial property." An assessment of railroad property "at a value which bears a higher ratio to the true market value of such transportation property [*i.e.,* railroad property] than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property" is prohibited, § 306(1)(a), subject to a threshold requirement that the railroad assessments exceed by at least five percent the assessments of the other commercial and industrial property, § 306(2)(c).

   The section's coverage of both real and personal property discrimination is illuminated in § 306(3)(c), which defines "commercial and industrial property" as "all property, real or personal."

   The statute's all-inclusive scope accords with Congress' longstanding intent. In 1968, the Senate Committee on Commerce commented on a bill substantially similar to § 306:

   [The bill] is not intended to interfere with the classification of property by a State for rate purposes into the traditional breakdown of real property, tangible personal property, and intangible property, provided that carrier transportation real property is taxed at no higher rate than other real property; that carrier transportation personal property is taxed at no higher rate than other personal property; and that carrier transportation intangibles are taxed at no higher rate than other intangible property.

Senate Committee on Commerce, *Discriminatory State Taxation of Interstate Carriers,* S.Rep. No. 1483, 90th Cong., 2d Sess. 10–11 (1968) (commenting on S. 927) [hereinafter cited as S.Rep. No. 1483]. *See also* Senate Committee on Commerce, *Discriminatory State Taxation of Interstate Carriers,* S.Rep. No. 630, 91st Cong., 1st Sess. 11 (1969) (commenting on S. 2289).

3.  Section 306(2)(e) provides:

   [I]n the event that the ratio of the assessed value of all other commercial and industrial property in the assessment jurisdiction to the true market value of all such other commercial and industrial property cannot be established through the random-sampling method known as a sales assessment ratio study (conducted in accordance with statistical principles applicable to such studies) to the satisfaction of the court hearing the complaint that transportation property has been or is being assessed or taxed in contravention of the provisions of this section, then the court shall hold unlawful an assessment of such transportation property at a value which bears a higher ratio to the true market value of such transportation property than the assessed value of all other property in the assessment jurisdiction in which is included such taxing district and subject to a property tax levy bears to the true market value of all such other property, and the collection of any ad valorem property tax on such transportation property at a tax rate higher than the tax rate generally applicable to taxable property in the taxing district.

4.  Congress was well informed of the statistical methods involved in a sales-assessment ratio study. *See, e.g., Tax Assessments on Common Carrier Property: Hearings on H.R. 4972 Before House Comm. on Interstate and Foreign Commerce,* 89th Cong., 2d Sess. 81 (1966) (statement of Charles Conlon, Executive Secretary, National Association of Tax Administrators) (general acceptance of sales-assessment ratio studies, citing his association's *Guide for Assessment Ratio Studies* (1954) with regard to the methodology such studies entail).

the year 1980 is not questioned on appeal. A sales-assessment ratio study established that, taking Mecklenburg County by way of example, the real properties of other commercial and industrial taxpayers were assessed at 72 percent of actual value, while the railroads were taxed at essentially full value.[5] The difference stems from the state's reassessment procedures. Railroad property, both real and personal, is reappraised annually by state authorities. N.C. Gen.Stat. §§ 105–288 and 105–338 through 105–341. Residential and other non-public utility real properties, on the other hand, are taxed in North Carolina on the basis of assessments revised no more frequently than once every eight years by local authorities. N.C.Gen.Stat. §§ 105–285 and 105–286. The long delay between assessments presumably was introduced by statute to moderate the impact of inflation and no doubt also to minimize anticipated disgruntled cries of numerous taxpayers. The consequence, however, is clear: railroad assessments keep pace with the steady increases in true market value brought about by inflation, whereas the assessments for most commercial and industrial taxpayers do not.

The question presented by the state on appeal is whether, concentrating for simplicity's sake on the situation in Mecklen-

**5.** The 72 percent figure requires some explanation. The parties stipulated to the assessment ratios applicable to all commercial and industrial real property assessed *locally* by each of North Carolina's 100 counties; the 72 percent ratio for Mecklenburg County was among those stipulated assessment ratios. The sales-assessment ratio study for Mecklenburg which produced the 72 percent figure, however, did not include *all* commercial and industrial property in the county. That is so because, under North Carolina law, most property owned by public service companies is not assessed by the local county authorities but, rather, is assessed *centrally* by state authorities. *See* N.C.Gen. Stat. §§ 105–333 through 105–341.

We agree with the district court's conclusion that § 306 requires that, for purposes of determining whether discrimination exists, both the locally assessed and the centrally assessed properties of commercial and industrial taxpayers must be considered; the definition of "all other commercial and industrial property," § 306(3)(c), will admit of no other conclusion. *See Ogilvie v. State Board of Equalization,* 657 F.2d 204 (8th Cir.1981). Yet we also agree, despite the state's entreaties to the contrary, with the district court's conclusion that inclusion of the centrally assessed properties would not materially affect the 72 percent figure and, consequently, the case as to real property discrimination could proceed in reliance upon the stipulated ratios.

The district court reasoned that the centrally assessed property was to be considered for purposes of deriving a *median* assessment ratio—that is, the ratio applicable to the property which rests at the 50th percentile of an array of properties listed according to their respective assessment ratios, the lowest ratio assuming the 1st percentile, the highest ratio assuming the 100th percentile. Because few taxpayers are public service companies, the inclusion of those taxpayers in the array would not significantly affect the median.

The state contends that the district court erred, arguing that a *weighted average* measure should be calculated once the centrally assessed properties are aggregated with the locally assessed properties. Because public service companies typically own vast amounts of property and because, under North Carolina law, those companies are assessed in the same way as are railroads, the state is correct in observing that a weighted average would yield a figure greater than 72 percent and, thus, would lessen the appearance of discrimination against the railroads.

We are unpersuaded, however, by the state's argument in support of the weighted average method. While there are isolated references in the legislative annals that suggest the appropriateness of a weighted average method, *see, e.g., Common and Contract Carrier State Property Tax Discrimination: Hearing Before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 2d Sess. 6 (1970) (statement of Rep. Staggers, commenting on S. 2289), it cannot be gainsaid that Congress clearly intended that railroads should be treated comparably to all other commercial and industrial taxpayers—and not merely to all other public service company taxpayers. The latter would tend to be the consequence if a weighted average is used; discriminatory treatment of other large taxpayers would skew an arithmetical average. Perhaps that explains why, as the testimony below revealed, the standard practice in the field of sales-assessment ratio studies is to employ the median method.

Bearing in mind the remedial purposes of § 306 and the overriding concern of Congress for a method that "make[s] possible the fairest comparison—that of the carrier with the hypothetical 'average' taxpayer," S.Rep. No. 1483, 90th Cong., 2d Sess. 23 (1968), we believe the district court chose the correct method.

burg County, the district court erred when it ordered that *all* railroad property—both real and personal—was to be assessed at no greater than 72 percent of its true market value.[6] The district court, in short, applied the 72 percent factor developed for real estate not only to real estate but to personal property as well. The state contends that there is no discrimination among taxpayers with regard to personal property because the personal property of all taxpayers, public utilities and non-utilities alike, is reappraised annually at virtually full market value. Consequently, argues the state, the railroads enjoy an undue windfall under the district court's order which lowers the assessment ratio on their personalty from 100 percent to 72 percent. The overall percentage figure for real property and personal property combined, under the state's theory, should almost inevitably work out to greater than 72 percent.

The essential problem faced by the district court was quite simple: the record was devoid of any information as to what portions of the railroads holdings were, respectively, real property and personal property. The narrow question we must answer is whether, when confronted with such a void in proof, the district court may correct a perceived discrimination as to the real property and, in so doing, order a reduction in assessments which necessarily must embrace personal property as well.

■ The answer to our question requires a consideration of where the burden of

proof fell once discrimination, even though shown only as to real estate, had been established. We are satisfied that once North Carolina was shown to have practiced discrimination with regard to real property under its statute which applies a single undifferentiated assessment to both real property and personal property,[7] the state assumed the burden of establishing facts sufficient both to warrant a different conclusion with respect to personal property and to enable the district court to fashion a decree that would not frustrate efforts to alleviate the discrimination already proven as to real property.

That conclusion accords fully with the letter of § 306. Under § 306(2)(d), "the burden of proof with respect to the determination of assessed value and true market value shall be that declared by the applicable State law." Under North Carolina law, the Property Tax Commission is obligated to order a reduction in the assessment of a railroad's property once the railroad establishes an "inequitable difference" between its assessment and that of taxpayers whose property is assessed locally by county authorities. N.C.Gen.Stat. § 105–342(c)(5). Proof of that "inequitable difference" (defined, for state equalization purposes, as a difference of 15 percent, § 105–342(c)(4)), rebuts the presumption of correctness which an appraisal enjoys, *e.g., In re Appeal of Amp, Inc.,* 287 N.C. 547, 215 S.E.2d 752 (1975), and can be supplied, under § 105–342(c)(5), by the selfsame sales-assessment ratio study favored by § 306(2)(e). We con-

6. Rather than striking down North Carolina's tax on railroad property as an outright nullity, the district court followed the clear mandate of § 306(1)(a) and (2) and formulated a specific decree delineating the maximum lawful assessments applicable to each county. Indeed, Congress was concerned about the propriety of a federal court order which, in effect, declares a state's tax assessment invalid without nullifying it altogether. S.Rep. No. 1483, 90th Cong., 2d Sess. 11–13 (1968); *see also Moses Lake Homes, Inc. v. Grant County,* 365 U.S. 744, 752, 81 S.Ct. 870, 874, 6 L.Ed.2d 66 (1961) ("Only the appropriate taxing officials ... may assess and levy taxes ..., and the federal courts may determine, within their jurisdiction, only

whether the tax levied by those officials is or is not a valid one"). Congress, however, determined that the Constitution does not forbid an exercise of equitable powers of correction to protect federally declared rights, instead of total eradication of the unlawful state activity. S.Rep. No. 1483, 90th Cong., 2d Sess. 11–13 (1968). Neither party questions that congressional determination, nor doubts that § 306 constitutes a clear exception to the Federal Antitax Injunction Act, 28 U.S.C. § 1341, *see* § 306(2).

7. *See* N.C.Gen.Stat. §§ 105–333 through 105–341.

clude that, by proving discrimination as to real property, the railroads established an "inequitable difference" for purposes of § 306 and, thus, that any further burden in the case before us was the state's to bear.

■ The state asserts that it has, in any event, met its burden because certain statistics for Mecklenburg County respecting personal property assessments were developed which, it was stipulated, would be applicable for a number of other North Carolina counties. Those statistics reflected value ratios of assessment for personal property at or near 100 percent.

Even accepting that to be the case, North Carolina failed to set forth the evidence needed to carry the second half of its burden. Even if we assume that the record sufficed to permit a finding that all personal property, whoever the owner, was assessed at 100 percent of market value and that railroad personalty has not been treated in a discriminatory fashion, nevertheless there was literally no evidence in the record to show a breakdown by percentage for the railroads, appellees here, of the respective worths of their real and personal property holdings. Without that crucial evidence, the district court was incapable of determining that proportion representing real property to which the 72 percent figure should be applied and that proportion to which a higher ratio developed for personal property should be applied. The district court, as a consequence, was bound to alleviate the conclusively proven real property discrimination just as it did; the state failed to adduce evidence which would have allowed a meaningful alternative remedy to be fashioned.

■ In the course of preparation for trial, the state submitted a request for the production of documents under Rule 34 of the Federal Rules of Civil Procedure, asking from the railroads the very breakdowns which are lacking as between real property, on the one hand, and personal property, on the other.[8] The railroads replied that the breakdowns were not available and therefore could not be produced.[9] Whatever suspicion may attach to that answer when viewed by an appellate court, the fact is inescapable that the state of North Carolina merely accepted that answer and made no efforts to compel a response or otherwise to supply a crucial deficiency in its proof.[10]

Consequently, in the posture of the case as it stands before us, it is uncontradicted that the breakdown as to how much of the railroad holdings were personal property, on the one hand, and real property, on the other, was unattainable or in any event had not been obtained and is altogether absent from the record.

8. The request, dated September 2, 1981, provided:

Each plaintiff is hereby requested pursuant to Rule 34, Federal Rules of Civil Procedure, to produce for inspection and copying . . . by September 25, 1981, a financial statement or such other records and documents which will disclose the dollar value of each plaintiff's system personal property in North Carolina and the dollar value of each plaintiff's real property value in North Carolina, which combined dollar values of system property are in the North Carolina ad valorem tax assessment for each plaintiff for the 1980 tax year.

9. The response, dated September 11, 1981, provided:

The plaintiffs have no specific information which will disclose the dollar value of each plaintiff's system personal property in North Carolina and the dollar value of each plain-

tiff's system real property in North Carolina. Pursuant to N.C.G.S. 105–334, each of the plaintiffs has previously furnished the North Carolina Department of Revenue with specific financial information including the R–1, Annual Report to the Interstate Commerce Commission.

10. Under Rule 34 of the Federal Rules of Civil Procedure, the railroads acted within their rights. Once a party registers, by way of a timely response, an objection to a document request, "the initiative rests with the party seeking their production to move for an order compelling it." 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* ¶ 34.05[2] (2d ed. 1982). We of course have no reason to speculate here as to what the outcome might have been had the state brought a motion to compel discovery.

On the basis of that failure of proof, and realizing that the decision applies only with respect to a single year, 1980, we affirm the decision of the district court granting summary judgment. To the extent that the opinion of the district judge suggests that reliance should, under § 306(2)(e), be placed solely upon percentages derived from sales-assessment ratio studies of real estate to the exclusion of a similar inquiry into personal property by way of appraisal studies and expert testimony, we do not approve what the district judge had to say.[11] The statute makes clear that personal property, as well as real estate, is to be dealt with in the course of achieving equality and thereby eliminating discrimination.[12] We affirm the result reached in the district court on the quite different ground that the proof of the state failed as to the necessary data relevant to personal property. We do not accept the proposition that only proof as to real estate discrepancies was to be obtained, and then applied indiscriminately to both personal property and real property owned or used by the railroads. However, the difference in attitude as to the scope of the statute does not mandate a result contrary to the one reached by the district judge.

While it does not affect in any way our decision, an observation is merited that the result would be unfortunate were we to agree with the state's contention that the burden to produce the relevant figures as to personal property lies with the taxpayer. The information, assuming it can be obtained despite the negative answer to the document request undisputed in this case, would in all probability be quite costly to assemble. It undoubtedly was also costly to some degree to provide the information with respect to the real property which established, in the first place, the existence of discriminatory treatment.

It will not encourage the state to clean its Augean taxing stable unless some burden is placed on it to show that the discrimination is lesser or non-existent for personal property, once a pattern of discrimination stands revealed for real estate assessment. The

---

**11.** The district court construed § 306(2)(e) as evidence of a congressional preference for sales-assessment ratio studies as the be-all and end-all of a § 306 case. The assumption underlying that position is that Congress was willing to sacrifice accuracy with respect to personal property assessments in order to effectuate an efficient and simple remedy for the railroads, and thus determined that the result of a sales-assessment ratio study of real property is to be extended to serve as a conclusive proxy for the detailed appraisal studies needed to evaluate personal property assessments. The district court's view was followed in *Atchison, T. & S.F. Ry. v. Lennen,* 552 F.Supp. 1031 (D.Kan. 1982), but rejected in *Ogilvie v. State Board of Tax Commissioners,* No. IP 81–1203–C (S.D. Ind. May 4, 1982).

There might be some merit in the district court's position insofar as Congress may have taken for granted that the railroads invariably suffer worse treatment with regard to their personal property than they do with respect to their realty. Where that is the case, the extension of the ratio found for real property to personal property as well works no injustice, at least to the taxing authority; in point of fact, the defendant state benefits because full and independent proof of the personal property assessments inevitably would lead to a court order further reducing the state's assessments of the personality. *See, e.g., State Tax Discrimi-*

*nation Against Interstate Carrier Property: Hearing on S. 2289 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce,* 91st Cong., 1st Sess. 63 (1969) (statement of Rolf A. Weil, President, Roosevelt University).

Of course, North Carolina's position here takes the case out of the mold arguably contemplated by Congress. The state asserts that, unlike the vast majority of states, it actually achieves a more equitable treatment of personal property than of real property. A reflexive and, under the district court's theory, virtually axiomatic application of the assessment ratio deemed proper for realty to the personality as well would, in North Carolina's case, work to the state's detriment. That is indeed a harsh result which, in our opinion, neither § 306 nor its legislative history commands.

Naturally, the discussion here is directed only to the narrow question whether § 306(2)(e) obviates an independent proof of the state's treatment of personal property owned or used by the railroads. The larger question dispositive here—whether the *railroads* must, in all instances, submit that independent proof in order to obtain any relief whatsoever from discrimination on the real property side of the ledger—involves a separate and distinct inquiry.

**12.** *See* n. 2, *supra.*

state should not be able simply to continue to apply its tax statute, year after year, although its application unquestionably and indisputably has been shown for a prior year to be discriminatory for reasons which will not have changed. That would be exceedingly unfair to the railroads, if they, after having had to incur substantial expense in a subsequent year to achieve with respect to real estate the fair treatment to which they are manifestly entitled, must additionally assume the burden as to personal property all over again as well. On the state's view of things, the railroads would still, each successive year, have to accumulate information about personal property expensive to obtain.

Bearing in mind the remedial purposes of the Railroad Revitalization and Regulatory Reform Act of 1976, it is sensible that the burden of proof has been allocated to the state.[13] It also is sensible that the state's legislators be afforded an incentive to effect revisions necessary to eradicate the inherently discriminatory practices evidently imbedded in the present version of their state's law.

AFFIRMED.

---

**13.** Section 306 was designed to serve as a "plain, speedy, and effective remedy to eliminate discriminatory tax assessment and classification practices." S.Rep. No. 1483, 90th Cong., 2d Sess. 7 (1968). Congress was especially disturbed by the ineffectiveness of state equalization procedures, many of which were found to be "difficult, time consuming, and not productive of material relief." *Id.* at 6. Of course, Congress did provide that state burden-of-proof rules are to apply under § 306(2)(d), but, as we have already noted, application of North Carolina's law here achieves the very result which common sense and good policy would seek.