657 F.2d 204
 Richard B. OGILVIE, Trustee of the property of the Chicago,
Milwaukee, St. Paul and Pacific Railroad Company, a
corporation; Soo Line Railroad Company, a corporation; and
Burlington Northern, Inc., a corporation, Appellees,
v.
The STATE BOARD OF EQUALIZATION OF the STATE OF NORTH DAKOTA
and The Honorable Arthur A. Link, as Governor of the State
of North Dakota and Chairman of the State Board of
Equalization and The Honorable Byron L. Dorgan as Tax
Commissioner of the State of North Dakota and Secretary of
the State Board of Equalization, Appellants.
Richard B. OGILVIE, Trustee of the property of the Chicago,
Milwaukee, St. Paul and Pacific Railroad Company, a
corporation; Soo Line Railroad Company, a corporation; and
Burlington Northern, Inc., a corporation, Appellants,
v.
The STATE BOARD OF EQUALIZATION OF the STATE OF NORTH DAKOTA
and the Honorable Arthur A. Link, as Governor of the State
of North Dakota and Chairman of the State Board of
Equalization and The Honorable Byron L. Dorgan as Tax
Commissioner of the State of North Dakota and Secretary of
the State Board of Equalization, Appellees.
 Nos. 80-1679, 80-1738.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 14, 1981.
Decided Aug. 20, 1981.
 
 1
 Kenneth M. Jakes (argued), Robert W. Wirtz, Leo F. J. Wilking, Sp. Asst. Attys. Gen., for the State of North Dakota, Bismarck, N. D., for appellants/cross-appellees.
 
 
 2
 Byron D. Olsen, Vice President and Gen. Counsel, Minneapolis, Minn., Joseph J. Nagle, Gen. Counsel, Chicago, Ill., Steven L. Wood (argued), Burlington Northern Inc., St. Paul, Minn., Frank Magill, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., for appellees/cross-appellants.
 
 
 3
 Before LAY, Chief Judge, ROSS, Circuit Judge, and VAN PELT,* Senior District Judge.
 
 
 4
 VAN PELT, Senior District Judge.
 
 
 5
 This action was brought by three railroads, to-wit, the Milwaukee (by a trustee), the Soo Line, and the BN, the full names of which are above set forth, as plaintiffs, against The State Board of Equalization of the State of North Dakota, and others above named. A provision of the Railroad Revitalization and Regulatory Reform Act of 1976, hereinafter called the 4-R Act, vests United States District Courts with jurisdiction to prevent, restrain or terminate acts by a state and others which are prohibited under the 4-R Act. It is claimed that section 306 of the 4-R Act has been violated. Judge Paul Benson heard the case. His decision and order is reported at 492 F.Supp. 446 (D.N.D.1980).
 
 
 6
 The two cases before this court involve an appeal and cross-appeal from Judge Benson's order, which prohibited the State Board of Equalization of the State of North Dakota from (1) assessing the plaintiff railroads' personal property, including trade fixtures, for the tax year 1979; and (2) assessing the plaintiff railroads' remaining property at a ratio greater than 13.24% of true market value. On appeal, the appellant State Board contends (1) that the district court erred in failing to include car line companies as "other commercial and industrial property," as that term is used in § 306 of the 4-R Act thus bringing the proper level of assessment to 13.29% of true market value; and (2) that the district court erred in excluding the railroads' personal property from tax assessment.
 
 
 7
 On cross-appeal, the plaintiff-appellee railroads allege that the district court erred in including public utilities and airline companies as commercial and industrial property, and that if these entities were omitted the proper level of assessment would be 12.2% of true market value instead of the 13.24% level ordered by the district court.
 
 
 8
 Both parties agree that this case is controlled by § 306 of the 4-R Act.[1] However, they disagree as to the proper interpretation of this statute. The goal of this legislation was "to eliminate the long-standing burden on interstate commerce resulting from discriminatory State and local taxation of common and contract carrier transportation property."[2]
 
 
 9
 In order to better understand the Act, it may be helpful to refer briefly to its legislative history. The 86th Congress passed Senate Resolutions 29, 151 and 244 requesting a national transportation policy study. A preliminary draft report of the study presented during the 87th Congress consisted of over 700 pages. A portion of this report concerned ad valorem property taxation of railroads. It is stated in the report that:
 
 
 10
 (T)he Association of American Railroads was requested to submit any pertinent information available on relative tax discrimination in the matter of State and local taxes. A Table was submitted by the Association of American Railroads ... showing the extent of overpayment of railroad ad valorem taxes resulting from the assessment of railroad property at a percent of its value that is higher than the percent which the assessment of other taxpayer property is to the value of such other property. This confirmed the findings of this committee that there is a studied and deliberate practice of assessing railroad property at a proportion of full value substantially higher than other property subject to the same tax rates.
 
 
 11
 S.Rep.No.445, 87th Cong., 1st Sess. 458 (1961). The table referred to shows that in 1957 North Dakota assessed railroad property at 50% of value, while assessing all other property at 15.80% of value. Id. at 487. There were two proposals in the report to help alleviate the tax burden on railroads. One was a right-of-way exemption. The other proposal was put forth by the Association of American Railroads and was the basis for § 306 of the 4-R Act when it was enacted some 15 years later. An examination of the statute and of the language of the Railroad Association proposal shows the statute's paternity.[3]
 
 
 12
 After the report was submitted to the 86th Congress, bills were introduced in the 87th, 89th, 90th, 91st, 92nd and 94th Congressional sessions dealing with this subject matter.[4] In a report accompanying a bill introduced in the 90th Congress, North Dakota is shown for the year 1965 as having valued railroad property at 45% of value, and property of others at 25% of value, resulting in a 44% excessive tax.[5] In a report accompanying a bill introduced in the 91st Congress, North Dakota is shown for the year 1968 as having valued railroad property at 40% of value, and property of others at 23.40% of value, resulting in a 41.50% excessive tax.[6] In the 94th Congress the House and Senate introduced separate versions of the bill. The main difference between the two was that the Senate bill contained a provision that any state having in its constitution a "reasonable classification of property" would be exempt from the provisions of this law. The same provision was rejected as an amendment to the House bill. In the debate it was argued that such a constitutional provision was a form of discrimination in that the constitutions of approximately nineteen states contained such provision. It was further argued that there was nothing to prevent other states from amending their constitutions before the bill took effect, and such action would defeat the bill's purpose. A conference committee composed of members of both houses recommended the adoption of what was substantially the original Senate Bill, minus the constitutional exemption provision. It passed and became § 306, supra. The law was to take effect three years after enactment.
 
 
 13
 From this history, several things are apparent. The language of § 306 finally adopted closely followed that proposed by the Association of American Railroads, as above stated. The purpose of the legislation was to remedy discriminatory taxation against railroads. North Dakota was specifically named as a State which had a history of taxing railroads at a higher and discriminatory rate. Congress was unwilling to create any type of exemption whereby a state would not have to comply with this law,[7] and states were given three years to rectify any discrimination. Appellant State Board of Equalization did not change its property tax structure during the three year interim. The parties stipulated that in North Dakota there are four classes of property: (1) farmlands; (2) residential; (3) business real estate; and (4) state-assessed. The first three classes are assessed locally. The State Board of Equalization assesses the fourth class consisting of pipeline companies, electric, gas, heat and water companies, telephone and telegraph companies, mobile radio communication companies, car line companies, and railroads.
 
 
 14
 Section 306 went into effect on February 5, 1979. The statute provides in § 306(1)(a) that transportation property may not be subject to a property tax:
 
 
 15
 ... which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.
 
 
 16
 Commercial and industrial property is defined in § 306(3)(c) as:
 
 
 17
 ... all property, real or personal, other than transportation property and land used primarily for agricultural purposes or primarily for the purpose of growing timber, which is devoted to a commercial or industrial use and which is subject to a property tax levy.
 
 
 18
 Transportation property is defined in § 306(3)(d) as:
 
 
 19
 ... transportation property, as defined in regulations of the (Interstate Commerce) Commission, which is owned or used by a common carrier by railroad subject to this part or which is owned by the National Railroad Passenger Corporation.
 
 
 20
 In 1979, the State Board of Equalization assessed the fourth class of property at 16.8% of the market value of such property. No one disagrees that this was a higher tax than that assessed on "all other commercial and industrial property." The real issue in the case is what constitutes commercial and industrial property. Not surprisingly, the State Board of Equalization urges a definition which would result in the highest rate of taxation, and the railroads urge a definition which would result in the lowest rate of taxation.
 
 
 21
 In 1979, commercial and industrial property in North Dakota which was locally assessed, was assessed at 12.2% of market value. It was stipulated that if the commercial and industrial property classification includes centrally assessed pipeline companies, electric, gas, heat and water companies, telephone and telegraph companies and mobile radio communication companies as well as locally assessed property, then the railroads' real property would be assessed at 13.2% of true market value. If commercial and industrial property additionally includes airline company property, the railroads' real property would be assessed at 13.24% of true market value. If the term includes all properties other than railroad property, railroad real property would be assessed at 13.29% of true market value.
 
 
 22
 The district court concluded that the proper definition of commercial and industrial property included all such locally assessed and centrally assessed property with the exclusion of car line companies because they constituted transportation property under the Interstate Commerce definition of the term. The State Board contends that in order to arrive at such a conclusion, the court had to assume that all of the car line companies' property was held under lease or pooling agreements by common carrier railroads as opposed to property owned or held under lease by nonrailroad companies and placed in service with railroads under tariff arrangements. In support thereof, they cite General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940) and Greenville Steel Car Co. v. United States, 615 F.2d 911 (Ct.Cl.1980). These two cases involve sections of either the Tax Reform Act or Interstate Commerce Act which have no relation to the question currently before the court. The ICC definition does not turn on whether property is held under lease by private companies or railroads.[8] Furthermore, it is clear both in the definition itself and in the supplemental information made a part thereof, that this definition was written specifically for use with § 306 of the Railroad Revitalization and Regulatory Reform Act. Under supplemental information to the ICC definition of rail transportation property (see Commission order showing decision of December 13, 1978 in ICC docket number 36873), it is stated:
 
 
 23
 The Commission believes that section 11503(a) makes it clear that the definition of "Rail transportation property" being adopted in this proceeding applies only for purposes of section 11503. This definition does not affect transportation property as defined by the Internal Revenue Code nor does it affect the tax basis of depreciable property for Federal income tax purposes.
 
 
 24
 In response to the concern expressed by (Trailer Train Company) and (American Rail Boxcar Company), the Commission has adopted a definition which clearly indicates that rail transportation property includes equipment held under lease or pooling agreements. This has always been the Commission's intent.
 
 
 25
 Any reference to lease or pooling agreements in the supplemental information only seeks to broaden the definition by including the same, not to limit the definition.
 
 
 26
 Similarly, lacking in merit is appellee-cross-appellant's contention that only locally assessed property be used in determining the assessment ratio of commercial and industrial property. The Congress excluded agricultural property from the definition of commercial and industrial property, and could have excluded from the definition centrally assessed property or utilities or any other type of property it so desired. The fact is that it did not. We believe the district court was correct in determining that utilities and airlines, etc. constituted commercial and industrial property as that term is used in § 306.
 
 
 27
 The second issue on appeal is whether the district court erred in finding that the State Board of Equalization could not include personal property and trade fixtures in the assessed value of railroad property, because in North Dakota the personal property of locally assessed businesses is exempt from ad valorem property taxation. Section 306(1)(d) prohibits "The imposition of any other tax which results in discriminatory treatment of a common carrier by railroad subject to this part." The State Board of Equalization contends that the district court had no jurisdiction under § 306(3)(c) because commercial and industrial property is defined as that "which is devoted to a commercial or industrial use and which is subject to a property tax levy." The State Board also argues that there is a strong presumption in favor of the State's broad taxing power, and that the North Dakota Legislature has devised an equitable tax system which does not discriminate against railroads because locally assessed businesses pay an annual business privilege tax in lieu of personal property taxes. We believe the district court was correct when it concluded:
 
 
 28
 The intent of Congress in enacting § 306 was to protect interstate rail carriers from discriminatory property taxation. The most obvious form of tax discrimination is to impose a tax on a class of rail transportation property that is not imposed on other nonrailroad property of the same class. The inclusion of personal property in the assessed value of railroad property and other centrally assessed businesses imposes a personal property tax on centrally assessed businesses that is not imposed on locally assessed businesses.
 
 
 29
 As noted in our review of the history of this section, its purpose was to prevent tax discrimination against railroads in any form whatsoever. Congress rejected a proposed section of the bill which would have granted an exemption to states with a constitution providing for a "reasonable classification of property." North Dakota's rationalization that they have an equitable tax system because of a business privilege tax is nothing more than an attempt to resurrect, in a different form, an exemption from § 306 for states with a "reasonable classification of property." Congress did not accept the proposal and this court will not accept it. Likewise, the argument that there is a presumption in favor of the states' broad taxing power must fail where the purpose of the legislation was to curb the states' power to inequitably tax railroads.
 
 
 30
 North Dakota has had a long history of tax discrimination against railroads. It had adequate chance to remedy the situation before this law took effect. Not having done so, the district court properly interpreted both the language and intent of § 306. It correctly determined that personal property of the railroads was exempt from taxation, the same as all other commercial and industrial property, and that the real property of railroads was subject to an assessment ratio of 13.24% of true market value. The judgment and order of the district court is affirmed.
 
 
 
 *
 Robert Van Pelt, Senior District Judge, District of Nebraska, sitting by designation
 
 
 [1]
 For the reasons stated below, which was footnote 1 in the district court's opinion, both the parties and the district court have referred to the text of the original 4-R Act instead of the later recodification appearing in U.S.C
 ... Section 306 was originally codified at 49 U.S.C. § 26c. The Revised Interstate Commerce Act of 1978, Public Law 95-473, 92 Stat. 1337, recodified Subtitle IV of 49 U.S.C. Section 3(a) of the 1978 Revised Act provides that the Revised Act restates, without substantive change, laws enacted before May 16, 1978, and that the recodified Subtitle IV of 49 U.S.C. may not be construed as making a substantive change in the laws replaced. 92 Stat. 1466. The parties agree that the recodification of 49 U.S.C. § 26c at 49 U.S.C. § 11503 substantively changes § 306 of the 4-R Act. The court will therefore refer to and apply § 306 of the 4-R Act as originally enacted throughout this order.
 
 
 [2]
 This language comes from the statement of purpose found in S.Rep.No.1483, 90th Cong., 2d Sess. 1 (1968) accompanying S.927, and S.Rep.No.91-630, 91st Cong., 1st Sess. 1 (1969) accompanying S.2289. Both bills dealt solely with the taxation issue, which was later made a part of the 4-R Act
 
 
 [3]
 S.Rep.No.445, supra, at 465-66, indicates that the Association of American Railroads:
 proposed Federal law would declare the following action by any State, or governmental subdivision or agency thereof, whether such action be taken pursuant to a State constitutional provision, a statute, an administrative practice, or otherwise, to constitute an unreasonable and unjust burden upon interstate commerce and thereby forbidden and declared to be unlawful:
 (a) The assessment, for the purposes of a property tax levied by any taxing district, of property owned or used by any common carrier engaged in interstate commerce at a value which bears a higher ratio to the true market value of such property than the assessed value of all other property in the taxing district subject to the same property tax levy bears to the true market value of all such property.
 (b) The collection of any tax on the portion of said assessment so declared to be unlawful.
 To provide a forum other than at the State level to decide such unlawful assessment and collection of taxes it was further proposed that, notwithstanding the provisions of 28 U.S.C. § 1341, or of the constitution or laws of any State, jurisdiction is to be conferred upon the Federal district courts to enjoin after full hearing, any action declared under the preceding section to be unlawful, such jurisdiction not to be exclusive of that which any Federal or State court may otherwise have.
 This proposed antidiscrimination tax bill, which would be available to all common carriers engaged in interstate commerce, has the obvious merit of insuring that such carriers would receive equal treatment with other taxpayers subject to the same tax rates in accordance with applicable State law. The proposal in no way alters the freedom of the State to tax its taxpayers as in its discretion it deems best, so long as such carriers are accorded equal tax treatment with other taxpayers.
 That portion of § 306 which prohibits the states from discriminatorily taxing transportation property reads as follows:
 (1) Notwithstanding the provisions of section 202(b), any action described in this subsection is declared to constitute an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce. It is unlawful for a State, a political subdivision of a State, or a governmental entity or person acting on behalf of such State or subdivision to commit any of the following prohibited acts:
 "(a) The assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.
 "(b) The levy or collection of any tax on an assessment which is unlawful under subdivision (a).
 "(c) The levy or collection of any ad valorem property tax on transportation property at a tax rate higher than the tax rate generally applicable to commercial and industrial property in the same assessment jurisdiction.
 "(d) The imposition of any tax which results in discriminatory treatment of a common carrier by Railroad subject to this part."
 
 
 [4]
 See H.R.7421, 87th Cong., 1st Sess. (1961); H.R.4972, 89th Cong., 1st Sess. (1965); S.927, 90th Cong., 1st Sess. (1967); S.2289, 91st Cong., 1st Sess. (1969); S.1891, 93rd Cong., 1st Sess. (1973); S.2718, 94th Cong., 1st Sess. (1975)
 
 
 [5]
 S.Rep.No.1483, 90th Cong., 2d Sess. 4 (1968)
 
 
 [6]
 S.Rep.No.91-630, 91st Cong., 1st Sess. 5 (1969)
 
 
 [7]
 The only exception is that § 306 does not apply unless the "ratio of assessed value to true market value, with respect to transportation property, exceeds by at least 5 per centum the ratio of assessed value to true market value, with respect to all other commercial and industrial property in the same assessment jurisdiction. § 306(2)(c)."
 
 
 [8]
 The ICC final rule is as follows:
 The Railroad Revitalization and Regulatory Reform Act of 1976 made it illegal for a State to levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction. This final rule defines rail transportation property to include all property and other assets that comprise the entire operating unit devoted to the rail transportation service. This revision will provide a uniform definition for State taxing authorities to use in determining ad valorem and other property taxes for railroads.