The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a Delaware corporation, Plaintiff,

v.

The STATE OF ARIZONA; Arizona Department of Revenue; Counties of Apache, Coconino, Maricopa, Mohave, Navajo, Yavapai and Yuma, Defendants.

SOUTHERN PACIFIC TRANSPORTATION COMPANY, a corporation, Plaintiff,

v.

STATE OF ARIZONA; Arizona Department of Revenue; Counties of Cochise, Gila, Graham, Greenlee, Pima, Pinal, Santa Cruz and Yuma, Defendants.

Nos. CIV 81–1279 PHX CLH, CIV 81–1298 PHX CLH.

United States District Court,
D. Arizona,
Phoenix Division.

March 18, 1983.

A. Philip E. von Ammon, B. Andrew S. Friedman, Phoenix, Ariz., for plaintiffs.

Anthony B. Ching, Sol. Gen., James Winter, Asst. Atty. Gen., Phoenix, Ariz., for defendants.

## MEMORANDUM OPINION AND ORDER

HARDY, District Judge.

This case involves two actions by railroad companies seeking relief from allegedly discriminatory tax practices of the State of Arizona (State). In the first action, Atchison, Topeka & Santa Fe Railway Co. (Santa Fe) seeks relief under Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), 49 U.S.C. § 11503. In the second action Southern Pacific Transportation Co. (Southern Pacific) seeks relief under the 4–R Act, the 14th Amendment and 42 U.S.C. § 1983, and Section 42–204 of the Arizona Revised Statutes. Cross motions for partial summary judgment have been filed by the parties on the question of whether Arizona's scheme for assessing railroad property, A.R.S. § 42–227, complies with the 4–R Act. The State has also filed a motion to abstain which urges the Court to abstain from considering Santa Fe's claims that Arizona is guilty of (1) *de facto* discrimination against it in assessing its property, (2) violating 42 U.S.C. § 1983, and (3) Section 42–204 of the Arizona Revised Statutes. Because the legal issues relating to the claims of Santa Fe and Southern Pacific under the 4–R Act are the same, the motions were consolidated for oral argument.

Partial summary judgment will be entered decreeing that A.R.S. § 42–227 does not comply with the 4–R Act, although not to the extent urged by the railroads. The State's motion to abstain from considering the Sections 1983 and 42–204 claims will be

granted, but the motion to abstain from considering the 4–R Act claim of *de facto* discrimination will be denied.

## PART I. THE FACTS

### 1. *Historical Background*

Santa Fe and Southern Pacific are railroads that own property in numerous counties of Arizona. Accordingly, they are subject to the State's system of ad valorem property taxation.

For many years the railroads have contended that the State has placed illegally a heavier tax burden on them than on other property owners. In *Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 377 P.2d 770 (1963), the Arizona Supreme Court held that the State's property classification system whereby railroad property was assessed at 89% of full cash value rather than the 20% of full cash value applied to all other properties was discriminatory and illegal under the Arizona Constitution. This ruling caused the State to adopt a new property classification system. Four categories were created according to use and the railroads were placed in the category receiving the highest rate of assessment. This assessment system was challenged by Santa Fe in *Apache County v. Atchison, Topeka & Santa Fe Railway Co.,* 106 Ariz. 356, 476 P.2d 657 (1970), *appeal dismissed,* 401 U.S. 1005, 91 S.Ct. 1257, 28 L.Ed.2d 542 (1971) and was found to be constitutional.

### 2. *The 4–R Act*

Responding to rulings by state and federal courts similar to that in *Apache County, supra,* Congress passed the 4–R Act. The purpose of the 4–R Act is to encourage the revitalization of the railroad industry by prohibiting discriminatory property taxation of railroads by the states. *State of Arizona v. Atchison, Topeka & Santa Fe Railway Co.,* 656 F.2d 398, 400 (9th Cir. 1981).

The 4–R Act[1] may be summarized as follows: A state or its subdivisions are prohibited from:

---

1. Section 306 of the 4–R Act was originally codified at 49 U.S.C. § 26c. However, before it went into effect, it was recodified at 49 U.S.C. § 11503 as part of the general revision of com-

(1) Assess[ing] rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy[ing] or collect[ing] a tax on an assessment that may not ɔe made under clause (1) of this subsection.

(3) Levy[ing] or collect[ing] an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) Impos[ing] another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under Subchapter I of Chapter 105 of this title.

49 U.S.C. § 11503(b). The term "commercial and industrial property" as it is used in the Act is defined as "property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy." 49 U.S.C. § 11503(a)(4). The 4–R Act provides the district courts with jurisdiction to prevent violations of the Act, "notwithstanding section 1341 of title 28 [the Tax Injunction Act], only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." 49 U.S.C. § 11503(c). The preferred method of determining the ratio of assessed value to true market value of commercial and industrial property is use of the "random-sampling method known as a sales assessment ratio study."[2] *Id.*

### 3. *The Property Tax System of Arizona*

■ To comply with the 4–R Act, the State was forced to alter its property tax system. The State first took the position that the 4–R Act prohibited the State from making an assessed valuation of railroad property that was 5% higher than *all* other commercial and industrial property. This interpretation was rejected in *Arizona v. Atchison, Topeka & Santa Fe Railway Co., supra.* Instead, the 4–R Act requires that the assessment ratio for railroads not exceed by 5% the *average* of the assessment ratios for all other commercial and industrial property. *Id.*

In response to this ruling, the State enacted the present property tax system. Property taxes in Arizona are divided into two types: primary, or the basic property tax, and secondary, or those taxes levied to pay off bonded indebtedness. A.R.S. § 42–201(7), (9). Primary and secondary taxes are exacted in the same manner. The first step is to arrive at a value for the property to be taxed. For secondary tax purposes, this value is the "full cash value" or the market price of the property. A.R.S. §§ 42–201(4), 42–227(A). For primary tax purposes, this value is the "limited property value." The limited property value in primary tax computation was created when the State enacted a ceiling on the amount

---

merce laws under the Interstate Commerce Act of 1978. By congressional mandate, the recodified laws were not to be construed as making substantive changes in the statutes as originally enacted. But the language of each codification does differ. The Ninth Circuit has concluded, however, that only the recodification was put into effect, and therefore only the recodification should be considered for purposes of interpretation. *Arizona v. Atchison, Topeka & Santa Fe Railway Co., supra* at 404.

**2.** The sales assessment ratio study is a statistical study used to measure the average ratio of market value to assessed value of locally-as-sessed property within a tax jurisdiction. The method of the study is randomly to select recently sold properties and to compare the sales prices with the assessed values. This composite of randomly-selected properties can provide, within a margin of error, the average ratio of market value to assessed value of property in the jurisdiction. *See Louisville & Nashville Railroad Co. v. Public Service Commission,* 493 F.Supp. 162, 164 n. 2 (M.D.Tenn. 1978), *aff'd* 631 F.2d 426 (6th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 384 (1981).

that any real property can increase in value for assessment purposes in a given year. Ariz. Const., art. IX, § 18. By law the growth limit applies only to real property and is not available to properties within classes one and two discussed below. A.R.S. § 42–201.02(G), (H).

Once the limited property value or the full cash value is determined, an assessed value is calculated according to an assessment percentage. Arizona law divides real and personal property into eight assessment categories. A.R.S. § 42–136. Classes one, two and seven are assessed centrally by the State, and the remaining five classes are assessed locally by each county. The property in each category is assessed at a statutorily-fixed percentage of its full cash or limited property value, whichever is applicable. The statutory assessment scheme can be summarized for the relevant years as follows:

| Class | Property Type | Assessment Percentage |
|-------|---------------|----------------------|
| 1 | Flight Property, Mines, Standing Timber | 52% |
| 2 | Utilities | 44% |
| 3 | All Commercial and Industrial Property not in classes 1, 2, 4, 5(b & c), 6 and 7 | 25% |
| 4 | Agricultural | 16% |
| 5 | Residential | 10% |
| 6 | Leased Residential | 18% |
| 7 | Railroads | see formula below |
| 8 | Historical | 8% |

A.R.S. §§ 42–136, 42–227. A uniform rate of tax[3] is applied to the assessed value to determine the amount of tax owed.

In an effort to comply with the 4–R Act, the State does not have a fixed assessment percentage for railroad property. Rather, the assessment percentage is determined by a formula keyed to the requirements of the 4–R Act itself.[4] In 1980, the assessed value was 34% of the full cash value and limited property value. Thereafter, the percentage must be equal to the ratios which

**3.** The average property tax exacted by the counties is, for primary taxes, $7.47 per $100 and, for secondary taxes, $1.86 per $100.

**4.** The Ninth Circuit Court of Appeals has noted that this provision "arguably bring[s] Arizona

(1) The total assessed valuation for secondary tax purposes of all property in classes 1, 2 and 3 bears to the total full cash value of such property and such ratio shall be used for secondary tax purposes as required by federal law.

(2) The total assessed valuation of all property for primary tax purposes in classes 1, 2 and 3 bears to the total limited valuation used for primary tax purposes of such property and such ratio shall be used for primary tax purposes as required by federal law.

A.R.S. § 42–227 B.7(i) & (ii).

## PART II. THE RAILROADS' CLAIMS

### 1. *Southern Pacific's Action*

Southern Pacific's claims against the State are in five counts. The first claims that, for the year 1980, the assessment percentage of 34% imposed upon Southern Pacific exceeded by at least 5% the ratio of assessed value to true market value of all other commercial and industrial property in the same assessment jurisdiction in violation of the 4–R Act. The second count makes the same allegation for the tax years 1981 and 1982. The assessment percentage is alleged to violate the 4–R Act by:

(1) Excluding from the calculation of the assessment ratio for commercial and industrial property leased residential property and commercial personal property that is tax-exempt.

(2) Including in the calculation of the assessment ratio for commercial and industrial property standing timber and utilities.

(3) Valuing Southern Pacific's property above fair market value.

(4) Valuing other commercial and industrial property below fair market value.

Jurisdiction for the first and second counts is predicated on the 4–R Act itself. 49 U.S.C. § 11503(b).

into permanent compliance with Section 306" of the 4–R Act. *State of Arizona v. Atchison, Topeka & Santa Fe Railway Co., supra* at 403 n. 5.

The third count claims that the undervaluation of commercial and industrial property and the overvaluation of Southern Pacific's property by the State and its counties violates the plaintiff's right of equal protection of the law under the U.S. Constitution and 42 U.S.C. § 1983. Jurisdiction over this claim is based on 28 U.S.C. § 1343.

The fourth and fifth counts claim that the overvaluation and undervaluation alleged in the first and second counts violate Arizona law. Jurisdiction over these claims is based on the doctrine of pendent jurisdiction.

### 2. Santa Fe's Action

The claim of Santa Fe is the same as count two of Southern Pacific's action. The alleged method of violation differs from Southern Pacific's count two in that Santa Fe claims that the assessment ratio should include personal agricultural property (class four) as well and should exclude all centrally-assessed properties (classes one and two).

### PART III. DE JURE DISCRIMINATION UNDER THE 4–R ACT

Southern Pacific and Santa Fe seek relief under the 4–R Act by alleging violations under two separate theories of discrimination recognized in the case law interpreting the 4–R Act. These two theories are *de jure* and *de facto* discrimination.

*De jure* discrimination occurs when railroad property is required by statute to be taxed or assessed at a rate different from the average rate applied to other commercial and industrial property. *Clinchfield Railroad Co. v. Lynch,* 527 F.Supp. 784, 785 n. 5 (E.D.N.C.1981), *aff'd,* 700 F.2d 126 (4th Cir.1983). *See also Ogilvie v. State Board of Equalization,* 492 F.Supp. 446 (D.N.D.1980), *aff'd,* 657 F.2d 204 (8th Cir.1981); *Louisville & Nashville Railroad v. Louisiana Tax Commission,* 498 F.Supp. 418 (M.D.La.1980). In this type of case, discrimination occurs when the state fails to include all forms of commercial and industrial property when determining the average assessment rate, and consequently the assessment rate applied to railroad property exceeds by 5% the average assessment rate applied to commercial and industrial property in the tax jurisdiction.

*De facto* discrimination, on the other hand, occurs when the ratio of assessed value of railroad property to true value of the same property exceeds by 5% the ratio of assessed value of all other commercial and industrial property to the true value of the same property. In this type of case, a state tax statute may be valid on its face, yet because of systematic overvaluation of railroad property and undervaluation of other commercial and industrial property a violation of the 4–R Act may occur. *See Clinchfield Railroad Co. v. Lynch, supra; Atchison, Topeka & Santa Fe Railway Co. v. Lennen,* No. 80–4172 (D.Kan. Jan. 25, 1982).

The State has moved for partial summary judgment declaring that Arizona's ad valorem property tax laws, A.R.S. §§ 42–136, 42–227, are not in conflict with the 4–R Act. In other words, the State has moved for summary judgment as to the issue of *de jure* discrimination. The remainder of Part III will discuss the merits of this motion.

Section 42–227 of the Arizona Revised Statutes states that the assessment ratio of railroad property (class seven) must be the same as the average assessment ratio of classes one, two and three. The State's position, therefore, is that classes one, two and three constitute the entire range of commercial and industrial property as that term is used in the 4–R Act.

Southern Pacific and Santa Fe begin to go their separate ways when they argue this issue of *de jure* discrimination. Both agree that leased residential property (class six) and tax-exempt personal commercial property (not classified) should be included as commercial and industrial property and that utilities (class two) and standing timber, a part of class one property, should not be included. Santa Fe, however, argues for the exclusion of both utilities and all class one property on grounds that these classes of property are centrally-assessed and therefore were not intended to be considered as commercial and industrial prop-

erty. Santa Fe also urges that personal agricultural property (class four) must be included as commercial and industrial property under the 4–R Act.

### 1. Centrally-Assessed Property: Standing Timber and Utilities

■ Arizona divides responsibility for assessing the value of property between the state and the county governments. Property in classes one, two and seven—largely, property of the mines, utilities and railroads—are assessed centrally by the State each year. All other property is assessed locally by the counties each year. Santa Fe contends that centrally-assessed property should not be included within the term "commercial and industrial property" of the 4–R Act. This contention appears meritless at first glance; property such as mines and utilities are patently of an industrial character. Moreover, when the legislative history of the 4–R Act is considered, the lack of merit of this distinction between centrally-assessed and locally-assessed property is confirmed.

The legislative history, beginning as early as 1961, indicates that a major source of discrimination against railroads was the inconsistent assessment practices of state and local governments. Congress found that local assessment offices had a tendency to bow to political pressures to keep down assessed values of property. This practice existed despite state laws requiring that property be assessed at market value. State assessment offices were not subjected to the same political pressures because the state assesses types of property owned by groups either lacking the political strength or the economic incentive to demand low property value assessments. The resulting overvaluation of centrally-assessed property and undervaluation of locally-assessed property created in the past a chronic problem of de facto discrimination against centrally-assessed property owners. See S.Rep. No. 445, 87th Cong., 1st Sess. at 485 (1961).

The disparity between central and local assessments being a source of discrimination, Santa Fe concludes that the railroads'

rate of assessment should be compared only with that of locally-assessed commercial and industrial property. This conclusion, however, does not follow.

The legislative history suggests that a centrally-assessed and locally-assessed property dichotomy might provide the optimum means of measuring discrimination against the railroads, but the plaintiffs have shown nothing in the legislative history that indicates that the term "commercial and industrial property" was intended to embody this distinction. In fact, the type of property that railroads were to be compared with changed considerably during the years of debate over this legislation in its many different versions. In the early 1960's, the comparison was to be based on "all other property in the tax jurisdiction." S.Rep. No. 445, 87th Cong., 1st Sess. p. 465 (1961). See also S.Rep. No. 1483, 90th Cong., 2d Sess. p. 23 (1968). But by the early 1970's this comparison was changed to "commercial and industrial property." S.Rep. No. 92–1085, 92d Cong., 2d Sess. at 2 (1972); S.Rep. No. 94–585, 94th Cong., 1st Sess. pp. 14, 138 (1974). Before the final version was passed, a special provision permitting comparisons solely with public utilities was introduced and rejected. S.Rep. No. 92–1085, 92d Cong., 2d Sess. p. 2 (1972). The legislative history simply does not support the contention that a locally-assessed and centrally-assessed property distinction was intended originally, much less that it survived the changes that later occurred when the term "commercial and industrial property" was finally adopted. Had such a distinction been intended it would have been expressly stated in the form of an exclusion within the definition of the term. Consequently, the class one and two properties cannot be excluded because they are centrally assessed. Clinchfield Railroad Co. v. Lynch, at 130 (4th Cir.1983); Ogilvie v. State Board of Equalization, 657 F.2d 204, 209 (8th Cir.1981), cert. denied 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981).

■ Putting aside Santa Fe's argument for excluding centrally-assessed property, this issue whether utilities and standing

timber are commercial and industrial property requires little further analysis. The proposition that utilities are industrial is self evident. *See Ogilvie v. State Board of Equalization, supra; Atchison, Topeka & Santa Fe v. Lennen, supra; Clinchfield Railroad Co. v. Lynch, supra.* Any uncertainty as to whether agricultural property should be included as commercial and industrial property is clarified by the definition, which provides for the exclusion of *"land used for agricultural purposes or timber growing."* (emphasis supplied) This exception implies that all agricultural property other than land should be considered commercial and industrial property. Standing timber, therefore, is a form of commercial property and is properly considered by the State in determining the average assessment rate for commercial and industrial property under A.R.S. § 42–227. *ACF Industries, Inc. v. State of Arizona,* 561 F.Supp. 595 (D.Ariz.1982).

### 2. Tax-Exempt Personal Commercial Property

The 4–R Act defines "commercial and industrial property in part as property "subject to a property tax levy." 49 U.S.C. § 11503(a)(4). Under the Arizona Constitution, manufacturer's inventories, a form of personal commercial property that otherwise would be included in class three, is exempt from taxation. Ariz.Const., Art. IX, § 13. The plaintiffs contend that this property should be considered as commercial and industrial property because, as they interpret the language of § 11503(a)(4), manufacturers' inventories are "subject to a property tax levy" in the sense that it *could* be taxed if the people of Arizona chose to amend their constitution. But this interpretation is simply unreasonable. Property "subject to" a tax levy is property which is presently taxed. Property which is for any reason tax-exempt is excluded as a form of commercial and industrial property. *ACF Industries, Inc. v. State of Arizona, supra. See also Ogilvie v. State Board of Equalization, supra; Trailer Train Co. v. State Board of Equalization,* 511 F.Supp. 553

(N.D.Ca.1981). Manufacturer's inventories, therefore, are not commercial and industrial property under the 4–R Act.

### 3. Personal Agricultural Property

Santa Fe's argument that personal agricultural property should be included in the State's railroad tax formula is well taken. The term "commercial and industrial property" includes both real and personal property. *Clinchfield Railroad Co. v. Lynch, supra* at 787 (interpreting the 4–R Act in its original form). *See also ACF Industries, Inc. v. State of Arizona, supra* (standing timber); *Atchison, Topeka & Santa Fe Railway Co. v. Lennen, supra* (sales assessment ratio study may exclude personal commercial property even though the average ratio of commercial and industrial property includes personal property). The same reasoning that specifically permits standing timber to be included within the term "commercial and industrial property" leads ineluctably to the conclusion that personal agricultural property must also be included. The exclusion of "land devoted to agricultural use or timber growing" implies that all agricultural property other than land is included. To fashion a general exclusion for agricultural property would render this exclusion mere surplusage. Therefore, A.R.S. § 42–227, which excludes personal agricultural property from its formulation, is in conflict with the 4–R Act.

### 4. Leased Residential Property

Santa Fe and Southern Pacific contend that leased residential property (class six) should be included as commercial and industrial property. In the context of leased residential property, the term "commercial and industrial property" is ambiguous. The property itself may be ultimately put to a noncommercial use—residential—but the owner puts it to a commercial use by renting it to others. The circular definition of commercial and industrial property provided in the 4–R Act merely confirms this ambiguity: commercial and industrial property is property "devoted to a commercial or industrial use." Not surprisingly, the

State urges upon the Court a narrow interpretation, namely, that the determination of whether property is devoted to a commercial or industrial use requires the Court to focus on the ultimate use of the property, while the plaintiffs advance a broad interpretation that would focus on the use made of the property by its owner.

The popular meaning of the phrase "commercial and industrial property" is probably a product of zoning law. Zoning law divides land according to types of uses. The general categories of use are residential, commercial, industrial and agricultural. Commercial and industrial property in this context is perforce determined according to its ultimate use. Control over the ultimate permissible use of land is the purpose of zoning. If land is zoned for use as a base for sales or service (commerce) or fabrication of products (industry) it is commercial or industrial property. Property zoned to authorize leased residential uses usually has been classified as residential as opposed to commercial property. *See e.g. Chast Realty Corp. v. Frost*, 198 Misc. 814, 100 N.Y.S.2d 739 (1950); *Shepherd v. State*, 427 S.W.2d 382 (Mo.1968). *But see Shady Grove v. Parish of Jefferson*, 203 So.2d 869 (La.App. 1967).

Applying the general principle that statutory language is to be strictly interpreted to effect legislative intent, the 4–R Act does not appear to use this popular meaning of the term "commercial and industrial property".[5] Rather, as the term is used in the 4–R Act, "commercial and industrial property" is property from which the owner derives income.

The analysis in prior 4–R Act cases as well as the analysis provided in this opinion, indicates that a broad rather than a narrow interpretation is to be preferred in light of the 4–R Act's definition of the term "commercial and industrial property". The popular meaning of this term is already inadequate. It would exclude agricultural property, yet it is established that all agricultural property other than land is to be included as commercial and industrial property. *See ACF Industries, Inc. v. State of Arizona, supra* at 598. *See also* Part III, sections 1 & 3, *supra.* A broad definition which sweeps beyond the popular meaning of this term, is implied by the definition. The Court of Appeals for the 10th Circuit has noted that an expansive definition of "commercial and industrial" property is called for in this statute because Congress has chosen to selectively exclude certain forms of property:

> The Congress excluded agricultural property from the definition of commercial and industrial property, and could have excluded from the definition centrally assessed property or utilities or any other type of property it so desired. The fact is it did not.

*Ogilvie v. State Board of Equalization, supra* at 255.

A broad interpretation that focuses upon the owner's use of the property is also more consistent with the Congress' clear intent to measure discriminatory taxation and provide appropriate relief. The 4–R Act is concerned with commercial and industrial uses of land only for the purpose of eliminating discriminatory tax treatment. Specifically, the 4–R Act is an attempt to establish uniformity between the tax rates of railroads and the "hypothetical average taxpayer." *State of Arizona v. Atchison, Topeka & Santa Fe Railway Co., supra* at 404 (citing S.Rep. No. 91–630, 91st Cong., 1st Sess. 10 (1969)). This intent to measure one taxpayer's burden against another's applies equally to determine which taxpayers the railroads should be measured against. In this case, the proper taxpayers are those who use their property commercially as the railroads do. For tax purposes,

---

**5.** This popular meaning of "commercial and industrial property" was evidently the basis for the district court's ruling in *ACF Industries, Inc. v. State of Arizona, supra,* the only case to consider this issue. The court held that leased residential property was not included within the meaning of "commercial and industrial property" under the 4–R Act. *ACF Industries, Inc. v. State v. Arizona, supra* at 598. Based on the analysis to follow, I disagree with Judge Cordova's ruling.

leased residential housing is a commercial use of property by the owner. *Cf. Little-hales v. District of Columbia,* 130 F.2d 402 (D.C.Cir.1942) (business license tax applies to apartment owner); *Lewis v. Town of Brandon,* 132 Vt. 37, 313 A.2d 673 (1973) (apartment buildings constituted "commercial property" within statute providing that a municipal corporation shall have power to authorize its legislative branch to enter into tax stabilization contracts with industrial and commercial owners of real and personal property). Therefore, leased residential property should be included as commercial and industrial property under the 4–R Act.

### 5. Conclusion

■■■ A.R.S. § 42–227, which permits comparison of the assessment ratio of railroad property with that of classes one, two and three only, is in conflict with the 4–R Act because personal agricultural property and leased residential property are not a part of the formula for determining the average assessment ratio for commercial and industrial property.

This is not to say, however, that the 4–R Act has been violated or that the Court is authorized to grant relief. Issues of fact remain as to what the average assessment ratio of commercial and industrial property is and whether this average assessment ratio exceeds by 5% the assessment ratio of railroad property.

### PART IV. THE STATE'S MOTION TO ABSTAIN

■■■■ A claim of *de facto* discrimination necessitates a study of the accuracy of property assessment and a measurement of any disparity between assessment ratios of railroad property and other commercial and industrial property. In this respect, a *de facto* discrimination claim under the 4–R Act would closely resemble a state law claim for tax discrimination under the A.R.S. §§ 42–204 and 42–151 because the factual issues are similar. *See e.g. Department of Property Valuation v. Salt River Project,* 27 Ariz.App. 110, 551 P.2d 559, *reversed on other grounds,* 113 Ariz. 472, 556 P.2d 1134, *appeal dismissed,* 431 U.S.

901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1976). Indeed, state courts have concurrent jurisdiction to entertain 4–R Act claims. *See Missouri Pacific Railroad Co. v. Tax Division,* 504 F.Supp. 907 (E.D.Ark.1980) (interpreting the original Act).

The State advances two arguments in effort to dispose of the *de facto* discrimination claim. Although for different reasons, both arguments rest upon a conclusion that state court is the proper jurisdiction to hear a claim of *de facto* discrimination under the 4–R Act. The State first opposes the plaintiffs' claim with the argument that the 4–R Act should be interpreted not to permit the federal court to hear claims of *de facto* discrimination. Second, the State argues that in the interests of comity this Court should abstain from hearing this claim.

### 1. The 4–R Act and the Moses Lake Homes Case

The State contends that if a federal court were to verify the accuracy of assessments and grant relief for discrimination such actions would be outside of the court's jurisdiction and in conflict with the Supreme Court's holding in *Moses Lake Homes, Inc. v. Grant County,* 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961) that "Federal Courts may not assess or levy taxes." The State urges, consequently, that the 4–R Act should be interpreted to permit federal courts to hear only *de jure* discrimination claims so as to avoid any constitutional infirmity.

In *Moses Lake Homes,* the Supreme Court held that a county's discriminatory assessment and taxation of federal leaseholds (Wherry Act Leaseholds) resulted in the assessment and tax being void in their entirety. Further, the Court held that the court of appeals erred in remanding the case to the district court for the purpose of reducing the tax to what it would have been if the assessment and tax had not been discriminatory:

> The effect of the Court's remand was to direct the District Court to decree a valid tax for an invalid one.... Only the appropriate taxing officials of Grant

County may assess and levy taxes on these leaseholds, and the federal courts may determine, within their jurisdiction, only whether the tax levied by those officials is or is not a valid one. 365 U.S. at 752, 81 S.Ct. at 874.

*Moses Lake Homes* appears relevant to the 4–R Act only insofar as it imposes restrictions upon the relief that a federal court may order for state tax practices that violate federal constitutional or statutory law. It does not limit a federal court's jurisdiction to determine whether a state tax violates federal law and, therefore, does not limit the power of this Court to entertain a *de facto* discrimination claim under the 4–R Act. *See State of Tennessee v. Louisville & Nashville Railroad Co.,* 478 F.Supp. 199, 210 (M.D.Tenn.1979), *aff'd,* 652 F.2d 59 (5th Cir.), *cert. denied,* 454 U.S. 834, 102 S.Ct. 135, 70 L.Ed.2d 114 (1981) (federal court can declare state tax void and grant appropriate injunctive relief under 4–R Act). Arguably, the case may limit the scope of relief that may be granted. *See Southern Railway Co. v. State Board of Equalization,* No. 81–695 (N.D.Ga. Aug. 27, 1981); *State of Tennessee v. Louisville & National Railroad Co., supra.* But the issue of what effect *Moses Lake Homes* may have upon the form of relief the federal court may order under the 4–R Act is not raised in the motion for partial summary judgment.

### 2. *Abstention*

The State also opposes the plaintiffs' claims of *de facto* discrimination with a motion to abstain. Specifically, the State urges that, in light of the intrusions into state tax assessments and collections required by a *de facto* discrimination claim, this Court should abstain under the principle of comity.

"The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 812, 96 S.Ct. 1236, 1243, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). However, the federal courts have abstained in the exceptional circumstance when federal jurisdiction is invoked "for the purpose of restraining ... collection of state taxes." *Id.* 424 U.S. at 817, 96 S.Ct. at 1246. *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).

The Supreme Court has long recognized the central importance of taxation to state and local government and, under the principle of comity, has counseled restraint by federal courts when proceedings might interfere with the tax collection process:

It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes may derange the operations of the government, and thereby cause serious detriment to the public.

*Dows v. City of Chicago,* 11 Wall. 108, 110, 20 L.Ed. 65 (1870). Consequently, the Court adopted a rule that the comity principle is sufficient to override the obligation of federal courts to exercise jurisdiction when an action in equity is brought to restrain the collection of taxes and state law remedies are "plain, adequate, and complete." *Fair Assessment In Real Estate Association v. McNary,* 454 U.S. 100, 108, 102 S.Ct. 177, 182, 70 L.Ed.2d 271 (1981). Congress subsequently confirmed the propriety of this type of abstention when it adopted the Tax Injunction Act, 28 U.S.C. § 1341:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

In *Fair Assessment In Real Estate Association v. McNary, supra,* the Supreme Court extended the doctrine of abstention

in state tax collection cases to the context of actions for damages under 42 U.S.C. § 1983. Despite prior rulings that actions under 42 U.S.C. § 1983 do not require exhaustion of state remedies, *see Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court ruled that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts if the available state remedies are "plain, adequate, and complete." *Fair Assessment In Real Estate Association v. McNary, supra* 454 U.S. at 116, 102 S.Ct. at 186.

Relying upon *Fair Assessment,* the State contends that the Court should abstain from hearing the claims under the 4–R Act, § 1983, and state law because state law remedies are plain, adequate, and complete. While *Fair Assessment* requires this Court to abstain from considering the § 1983 and state law claims of Southern Pacific, other authority requires that this Court not abstain from hearing the 4–R Act claims because, in light of the 4–R Act and its legislative history, the state law remedies are not plain, adequate and complete.

The 4–R Act has an independent jurisdiction provision which states that "notwithstanding [the Tax Injunction Act] Section 1341 of Title 28 ... a district court of the United States has jurisdiction, concurrent with other jurisdictions of the courts of the United States and the States, to prevent a violation" of the 4–R Act. Congress, thus, has removed the Tax Injunction Act as a bar to the power of the federal courts to grant relief under the 4–R Act. The fact of this removal could be understood to imply that removal of the Tax Injunction Act was necessary for federal courts to hear 4–R Act claims because state law remedies were adequate. But the legislative history proves otherwise. The legislative history indicates that the removal of the Tax Injunction Act was done to insure that claims would be heard in federal court because state law remedies were either inadequate or inefficient:

The committee is convinced of the need for a Federal court procedural remedy as provided in S.2289. Section 1341 of title 28, United States Code, prohibits district courts from enjoining, suspending, or restraining the assessment, levy, or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State. The effect of this statute has been to close the doors of the Federal courts to carriers affected by discriminatory taxation. It has not, however, insured that the State courts provide carriers with a plain, speedy, and efficient remedy.

The testimony before the committee indicated that present State procedures to challenge discriminatory State tax assessments are often difficult, time consuming, and not productive of material relief....

To provide a plain, speedy, and effective remedy to eliminate discriminatory tax assessment and classification practices, the committee is convinced that a Federal court remedy is necessary.

S.Rep. No. 94–630, 91st Cong., 2d Sess. p. 608 (1969).

The 4–R Act and its legislative history are sufficient to conclude that Congress does not desire the federal courts to apply the court-created doctrine of abstention to claims under the 4–R Act. The jurisdiction of the lower federal courts is subject to the plenary control of Congress. *Klein v. Burke Construction Co.,* 260 U.S. 226, 233–34, 43 S.Ct. 79, 82, 67 L.Ed. 226 (1922). This finding of Congress that state law remedies are inadequate should be honored by the Court, and the Court would be remiss if it failed to exercise the jurisdiction given it by Congress. The motion to abstain from hearing the 4–R Act claims of the plaintiffs, therefore, should be denied. *Accord, Southern Pacific Transportation Co. v. State of California,* No. 81–4848 (N.D. Cal. Sept. 2, 1982); *Atchison, Topeka & Santa Fe v. Lennen, supra; Contra, Southern Railway Co. v. State Board of Equalization,* No. 81–695 (D.Ga. Aug. 27, 1981); *Missouri Pacific Railroad Co. v. Tax Division,* 504 F.Supp. 907 (E.D.Ariz.1981) (finding nothing in the Act or legislative history that nullifies the abstention doctrine).

The above considerations which call for the Court to hear the 4–R Act claims of the plaintiffs, however, are not present when determining this issue of abstention from hearing the § 1983 and state law claims of Southern Pacific. These claims must rest upon jurisdiction statutes that are independent of the 4–R Act. The Court, not Congress, therefore must weigh the comity principle in light of these claims and the potential for intrusion into state affairs that they pose. As to these claims, *Fair Assessment* controls the result. Like the State of Missouri in *Fair Assessment,* the State of Arizona has a statute providing for challenges to the validity of property assessments and taxation under state and constitutional law. *See Department of Property Valuation v. Salt River Project, supra.* The fact that Southern Pacific has attempted to bring the state law claim into federal court under pendent jurisdiction indicates that this state law claim has not been exhausted. Therefore, the motion to abstain from hearing the § 1983 and state law claims of Southern Pacific should be granted. *Accord, Southern Pacific Transportation Co. v. State of California, supra.*

3. *Conclusion*

The State's motion to abstain should be granted only as to the § 1983 and state law claims of Southern Pacific.

IT IS ORDERED as follows:

1. Granting partial summary judgment that A.R.S. § 42–227 is in conflict with the 4–R Act because personal agricultural property and leased residential property are not a part of the formula for determining the average assessment rates for commercial and industrial property.

2. Granting the State's motion to abstain from considering the Section 1983 and 42–204 claims.

3. Denying the State's motion to abstain from considering the *de facto* discrimination claim.